## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

|  |  |  |
|---|---|---|
| ELMER BUSH, individually and on behalf of all others similarly situated, | ) ) ) ) |  |
| Plaintiff, | ) ) ) |  |
| v. | ) ) ) | CIVIL ACTION NO.:  4:15-cv-1026 |
| ARCH COAL, INC., JOHN W. EAVES, PAUL A. LANG, JAMES R. BOYD, DAVID C. FREUDENTHAL, PATRICIA FRY GODLEY, PAUL T. HANRAHAN, DOUGLAS H. HUNT, BRIAN J. JENNINGS, J. THOMAS JONES, STEVEN F. LEER, GEORGE C. MORRIS, III, A. MICHAEL PERRY, ROBERT G. PORTER, JAMES A. SABALA, THEODORE S. SANDS, WESLEY M. TAYLOR, PETER I. WOLD, ALLEN R. KELLY, JOHN ZIEGLER, JR., MERCER FIDUCIARY TRUST COMPANY, ARCH COAL, INC. EMPLOYEE THRIFT PLAN RETIREMENT COMMITTEE, FINANCE COMMITTEE OF BOARD OF DIRECTORS OF ARCH COAL, INC., AND DOES 1-10, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) |  |

## CLASS ACTION COMPLAINT

Plaintiff Elmer Bush ("Plaintiff"), on behalf of the Arch Coal, Inc. Employee Thrift Plan

(the "Plan"), himself, and a class of similarly situated participants and beneficiaries of the Plan

(the "Participants"), alleges as follows:

## INTRODUCTION

1.      Arch Coal, Inc. ("Arch Coal" or the "Company"), is a domestic coal company that derives substantially all of its revenue from mining and selling coal to power plants, steel mills, and industrial facilities.  *See* Arch Coal Annual Report for Year-End 2014, at 5 (filed Feb. 27, 2015 ("2014 Form 10-K").  As of December 31, 2014, Arch Coal operated, or contracted out the operation of, 16 active mines located in each of the major coal-producing regions of the United States.  *See id*.

2.      Arch Coal provides its employees the opportunity to save for retirement through the Plan, which is a defined contribution plan.  *See* Arch Coal, Inc. Employee Thrift Plan Annual Report for Year-End 2014, at 4 (filed June 29, 2015) ("2014 Form 11-K").

3.      In essence, defined contribution retirement plans confer tax benefits on participating employees to incentivize saving for retirement.  An employee participating in a defined contribution plan may have the option of purchasing the common stock of his or her employer for part of his or her retirement investment portfolio.  In this case, Participants, through the Plan, had the option of purchasing the common stock of Arch Coal ("Arch Coal Stock" or "Company Stock").

4.      Plaintiff is a former employee of Arch Coal and was a Participant in the Plan during the Class Period (July 27, 2012 to the present), during which time the Plan and Plaintiff's individual account in the Plan, held interests in Arch Coal Stock.

5.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Arch Coal, the Finance Committee of the Board of the Directors (the "Finance Committee"), the Arch Coal, Inc. Employee Thrift Plan Retirement

Committee ("Retirement Committee"), and certain individual officers and management-level employees of the Company.

6.      The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its Participants.

7.      Plaintiff alleges that Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached duties owed to the Plan, to Plaintiff, and to the other Participants by, *inter alia*, retaining Arch Coal Stock as an investment option in the Plan when a reasonable fiduciary using the "care, skill, prudence, and diligence… that a prudent man acting in a like capacity and familiar with such matters would use" would have done otherwise.  *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

8.      Specifically, Plaintiff alleges in Count I that Defendants, each having certain responsibilities regarding the management and investment of the Plan's assets, breached their fiduciary duties to the Plan, to Plaintiff, and to the proposed Class by:  (a) continuing to offer Arch Coal Stock as an investment option for the Plan when it was imprudent to do so; and (b) maintaining the Plan's pre-existing significant investment in Arch Coal Stock when it was no longer a prudent investment for the Plan.  These actions/inactions run directly counter (i) to the express purpose of ERISA pension plans, which are designed to help provide funds for participants' retirement (*see* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY")), and (ii) the purpose of the Plan (*i.e.*, to help Participants save for retirement).

9.      Plaintiff's Count II alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan's and its Participants' best interests in mind.

10.     Plaintiff's Count III alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of the Plan's assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering Arch Coal Stock as an investment option and investing the Plan's assets in Arch Coal Stock when it was no longer prudent to do so.

11.     Plaintiff's Count IV alleges that Mercer Fiduciary Trust Company ("Mercer"), the Plan's trustee,[1] breached its fiduciary duties by blindly following the directions of the Plan's named and *de facto* fiduciaries, in violation of ERISA, when it was clearly imprudent to do so. Mercer continued to allow the Plan to hold and acquire Arch Coal Stock when it was clear, based upon publicly available information, that Arch Coal Stock was an objectively imprudent retirement investment option.

12.     The thrust of Plaintiff's allegations is that Defendants allowed the imprudent investment of the Plan's assets in Arch Coal Stock throughout the Class Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because of the sea-change in the basic risk profile and business prospects of the Company caused by *inter alia*:  (a) the collapse of coal prices which drastically and for the foreseeable future compromised Arch Coal's financial health; (b) the Company's deteriorating Altman Z-score ("Z-score") – a financial formula commonly used by financial professionals to predict whether a company is likely to go into bankruptcy – which indicated that Arch Coal was and is in danger of

---

[1]  Mercer HR Services serves as the Plan's recordkeeper.  *See* 2014 11-K at 8.

bankruptcy; (c) an excessive increase in the Company's debt to equity ratio; and (d) other indicia of the Company's financial distress, including mine closures and employee layoffs, as discussed further below.

13.     Defendants knew or should have known that continued significant investment of the Plan's Participants' retirement savings in Company Stock would inevitably result in substantial losses to the Plan and, consequently, to the Plan's Participants.   Indeed, as a consequence of the foregoing, the Plan and its Participants have suffered tens of millions of dollars of losses as the market price of Arch Coal has fallen from approximately $6.55 on July 27, 2012, the first day of the Class Period, to $0.42 (both adjusted closes) on June 29, 2015, the most recent trading day preceding the date of this filing – a decline of almost *100%*.

14.     Defendants recognized or should have recognized the severity of the problems at the Company during the Class Period as a result of the above factors, yet took no steps to protect the Plan and its Participants.

15.     ERISA requires fiduciaries to employ appropriate methods to investigate the merits of all plan investments as well as to engage in a reasoned decision-making process, consistent with that of a prudent person acting in a like capacity.   The duty of prudence also requires fiduciaries to monitor the prudence of their investment decisions to ensure that they remain in the best interest of the plan's participants.

16.     The Department of Labor ("DOL") has issued regulations interpreting the duty of prudence.   In order to comply with the duty of prudence, a fiduciary must give "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role that the investment or investment

5

course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties." 29 C.F.R. § 2550.404a-1(b)(1). "Appropriate consideration," according to DOL regulations, includes but is not necessarily limited to "(i)[a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed…to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action." 29 C.F.R. § 2550.404a-1(b)(2).

17.    A fiduciary who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is acting imprudently in violation of ERISA.

18.    Trust law, from which ERISA is derived, clarifies that a "trustee has a duty to the beneficiaries to invest and manage the funds of the trust as a prudent investor would, in light of the purposes, terms, distribution requirements, and other circumstances of the trust."[2]   *See* Restatement (Third) of Trusts § 90.

19.    When a trustee makes investment decisions, the trustee's conduct is judged using a "prudent investor" standard.  Restatement (Third) § 90, at 292.  The trustee must "invest and manage the funds of the trust as a prudent investor would, in light of the purposes, terms, distribution requirements, and other circumstances of the trust."  *Id.*  "[A] trustee's duties apply not only in making investments but also in monitoring and reviewing investments, which is to be

---

[2]   The Restatement (Second) of Trusts, which was effective when ERISA was enacted, states that:  "Except as otherwise provided by the terms of the trust, if the trustee holds property which when acquired by him was a proper investment, but which thereafter becomes an investment which would not be a proper investment for the trustee to make, it becomes the duty of the trustee to the beneficiary to dispose of the property within a reasonable time."  *Id.* at § 231 (1959).  The Uniform Prudent Investor Act (1994), which has been adopted by almost all states, recognizes that "the duty of prudent investing applies both to investing and managing trust assets. . . ."  Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994).  The official comment explains that "'[m]anaging' embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments."  *Id.* § 2 comment.

done in a manner that is reasonable and appropriate to the particular investments, courses of action, and strategies involved." *Id.* comment b, at 295. Indeed, "[t]he Uniform Prudent Investor Act confirms that '[m]anaging embraces monitoring' and that a trustee has 'continuing responsibility for oversight of the suitability of the investments already made." *Tibble, et al. v. Edison International et al.*, 135 S. Ct. 1823, 1828 (2015) (citing The Uniform Prudent Investor Act § 2, Comment, 7B U.L.A. 21 (1995)).

20.   In other words, "[p]rudence focuses on the process for making fiduciary decisions. Therefore, it is wise to document decisions and the basis for those decisions."[3] Thus a trustee must "make[] an investigation as to the safety of [an] investment and the probable income to be derived therefrom" and then make a reasonable investment decision based on that investigation. Restatement (Second) § 227 comment b, at 530.

21.   As similarly summarized in the Third Restatement: "***Changes in a company's circumstances***, ***adaptation to trust- and capital-market developments***, fine-tuning, and the like may, of course, justify the selling and buying of properties as an aspect of a prudent plan of asset allocation and diversification …. This is consistent with the trustee's ongoing duty to monitor investments and to make portfolio adjustments if and as appropriate, with attention to all relevant considerations, including tax consequences and other costs associated with such transactions." Restatement (Third) § 90 comment e(1) (emphasis added).

22.   Prudent investment management demands, *inter alia*, that Defendants not merely rely upon the fact that the price of Arch Coal Stock remains above $0 in determining whether investing in Company Stock was and is appropriate for the Plan. ERISA requires Defendants to scrutinize the risk of the Plan's investment in Arch Coal Stock – based upon, *inter alia*, the

---

[3] http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html

public information upon which the stock price is based and the risk inherent in the stock – to protect the Plan's Participants' retirement savings.

23.   Even if it may have been a reasonable investment for some investors, ERISA requires fiduciaries to avoid taking excessive risk with retirement assets.  After all, ERISA's fiduciary duties "have been described as 'the highest known to the law.'"  *See, e.g.*, *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

24.   As discussed below, several years before the start of the Class Period, certain obstacles to the U.S. coal industry's continued growth were quite apparent.  Among these obstacles were the increasing oversupply of coal, stiff competition from natural gas producers, and the transition of power generation plants to "cleaner" energy sources such as "renewable" and gas-fired thermal plants instead of coal, all of which crashed coal prices to levels not seen in years.[4]

25.   In April 2012, three months before the start of the Class Period, Moody's forecasted "permanent shifts" in the energy sector, as "depressed natural gas prices continue to put pressure on the coal generation sector."  *See Moody's foresees permanent shifts in energy sector over next decade*, SNL Power Week (Canada), Apr. 9, 2012.

26.   Thus, by the start of the Class Period, it was painfully obvious that Arch Coal was wholly-dependent upon a dying industry.

---

[4]  *See US Coal: the West Coast challenge*, Platts Energy Economist, Mar. 3, 2011 at 1; *see also* Nick Cunningham, *Latest Casualty in Energy's Hardest Hit Industry*, May 13, 2015.  Recently, Norway "made a big move toward dropping investments in coal companies by its massive $900 billion sovereign wealth fund because of their impact on climate change."  *See* Karl Ritter, *Norway's $900 billion oil fund to slash coal investments*, U.S. News & World Report, May 28, 2015, available at http://www.usnews.com/news/business/articles/201/05/28/norway-oil-fund-to-slash-coal-investments.

27.     The Plan's Participants had every right under ERISA to expect the Plan's fiduciaries to act in their interest and protect them from unduly risky investments, whether in the form of Company Stock or any other asset.

28.     In failing to investigate, analyze, and review whether it was prudent to continue investment in Arch Coal Stock in the Plan, Defendants acted with procedural imprudence.  Had Defendants conducted a prudent evaluation of whether Arch Coal Stock was an appropriate investment for the Plan during the Class Period, and taken appropriate Plan-protective action based upon what they would have discovered – such as ceasing the offering of Arch Coal Stock, divesting the Plan of Arch Coal Stock, or any of the other actions as described below – the Plan's Participants would not have suffered such devastating losses to their retirement savings.

29.     Pursuant to both the ERISA statute itself and the DOL rules and regulations implementing the statute, the Company's problems discussed herein – including the sky-rocketing debt-to-equity ratio, inherent risk of loss, and indeed the risk of bankruptcy – all should have made the Plan's fiduciaries aware of the imprudence of Arch Coal Stock.  *See* 29 C.F.R. § 2550.404a-1(b)(1) and (2).

30.     Given the totality of circumstances prevailing during the Class Period, no prudent fiduciary would have made the same decision to retain the clearly imprudent Arch Coal Stock as a Plan investment option.

31.     This action is brought on behalf of the Plan pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2), and seeks recovery of the losses to the Plan for which Defendants are personally liable.  Because Plaintiff's claims apply to the Plan as a whole, inclusive of all its Participants with accounts invested in Company Stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiff to sue for Plan-

wide relief for breaches of fiduciary duty such as those alleged herein, Plaintiff also brings this action under FED. R. CIV. P. 23(b) on behalf of all Participants and beneficiaries of the Plan whose Plan accounts were invested in Arch Coal Stock during the Class Period.

## JURISDICTION AND VENUE

32.     ***Subject Matter Jurisdiction.***  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

33.     ***Personal Jurisdiction.***  This Court has personal jurisdiction over all Defendants because they are all residents of the United States and ERISA provides for nation-wide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

34.     ***Venue.***  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and one or more Defendants reside or may be found in this district.

## PARTIES

### Plaintiff

35.     Plaintiff Elmer Bush is a former Arch Coal employee.  He is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held shares of Arch Coal Stock in his retirement investment portfolio during the Class Period.  During the Class Period, the value of shares in Arch Coal Stock within his Plan account diminished considerably as a result of Defendants' breaches of fiduciary duty a described herein.

### Defendants

#### Company Defendant

36.     Defendant Arch Coal is a Delaware Corporation with its principal place of business at One CityPlace, Suite 300, Saint Louis, Missouri.  As noted above, Arch Coal is a

domestic coal company, which as of December 31, 2014, operated, or contracted out the operation of, 16 active mines located in each of the major coal-producing regions of the United States.  *See* 2014 Form 10-K at 5.

37.     According to the 2014 Form 11-K, Arch Coal established the Plan "for the benefit of the eligible employees of the Company, its subsidiaries and controlled affiliates."  *See* 2014 Form 11-K at 4.

38.     Arch Coal is identified as the Plan Sponsor on the Plan's Forms 5500 filed with the Department of the Treasury, Internal Revenue Service, and Department of Labor ("DOL") for the plan years ending 2011, 2012, and 2013.

39.     At all relevant times, Arch Coal acted through its officers and employees, including the Board of Directors, who performed Plan-related fiduciary functions in the course and scope their employment.  Accordingly, the actions of the individual Defendants named herein, and other employee fiduciaries are imputed to Arch Coal under the doctrine of *respondeat superior*, and Arch Coal is liable for these actions.  Thus, Defendant Arch Coal was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

### Director Defendants

40.     At all relevant times, Arch Coal acted through its Board of Directors.

41.     Defendant John W. Eaves ("Eaves") served as Chairman, President, Chief Executive Officer, and Director of Arch Coal during the Class Period.  Defendant Eaves previously served as President and Chief Operating Officer of the Company from 2006 until he was appointed as Chairman and Chief Executive Officer in April 2012, the positions he currently holds.  Defendant Eaves was a fiduciary of the Plan, within the meaning of ERISA Section

3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

42.    Defendant Paul A. Lang ("Lang") served as Executive Vice President, Chief Operating Officer, and Director of Arch Coal during the Class Period.   Defendant Lang previously served as Executive Vice President-Operations from August 2011 to April 2012 when he was appointed Executive Vice President and Chief Operating Officer, the positions he currently holds.   Defendant Lang was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

43.    Defendant James R. Boyd ("Boyd") served as a Director, including as Lead Director, of Arch Coal during the Class Period.   Defendant Boyd served as Director from 1990 until 2014, and served as Chairman of the Board from 1998 to 2006.   Defendant Boyd was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

44.    Defendant David C. Freudenthal ("Freudenthal") served as a Director of Arch Coal during the Class Period.   Defendant Freudenthal joined the Board of Directors in 2011 and is a current member of the Board.   Defendant Freudenthal was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority

or control over Plan management and/or authority or control over management or disposition of Plan assets.

45.     Defendant Patricia Fry Godley ("Godley") served as a Director of Arch Coal during the Class Period.  Defendant Godley joined the Board of Directors in 2004 and is a current member of the Board.  Defendant Godley was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

46.     Defendant Paul T. Hanrahan ("Hanrahan") served as a Director of Arch Coal during the Class Period.  Defendant Hanrahan joined the Board of Directors in 2012 and is a current member of the Board.  Defendant Hanrahan was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

47.     Defendant Douglas H. Hunt ("Hunt") served as a Director of Arch Coal during the Class Period.  Defendant Hunt joined the Board of Directors in 1995 and is a current member of the Board. Defendant Hunt was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

48.     Defendant Brian J. Jennings ("Jennings") served as a Director of Arch Coal during the Class Period.  Defendant Jennings joined the Board of Directors in 2006 and served

on the Board until 2013. Defendant Jennings was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

49.     Defendant J. Thomas Jones ("Jones") served as a Director of Arch Coal during the Class Period. Defendant Jones joined the Board of Directors in 2010 and is a current member of the Board. Defendant Jones was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

50.     Defendant Steven F. Leer ("Leer") served as a Chairman of the Board of Directors and Director of Arch Coal during the Class Period. Defendant Leer served as Chairman of the Board of Directors from 2006 until April 24, 2014 when he retired after the annual meeting of Arch Coal stockholders. Defendant Leer previously served as Chief Executive Officer of Arch Coal from 1992 until April 2012, and as president of Arch Coal from 1992 to 2006. Defendant Leer was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

51.     Defendant George C. Morris, III ("Morris") served as a Director of Arch Coal during the Class Period. Defendant Morris joined the Board of Directors in 2012 and is a current member of the Board. Defendant Morris was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority

to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

52.      Defendant A. Michael Perry ("Perry") served as a Director of Arch Coal during the Class Period.  Defendant Perry joined the Board of Directors in 1998 and retired from the Board immediately after the annual meeting of Arch Coal stockholders on April 25, 2013. Defendant Perry was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

53.      Defendant Robert G. Porter ("Porter") served as a Director of Arch Coal during the Class Period.  Defendant Porter joined the Board of Directors in 2001 and served on the Board until 2013.  Defendant Porter was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

54.      Defendant James A. Sabala ("Sabala") served as a Director of Arch Coal during the Class Period.  Defendant Sabala joined the Board of Directors in 2015 and is a current member of the Board.  Defendant Sabala was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

55.      Defendant Theodore S. Sands ("Sands") served as a Director of Arch Coal during the Class Period.  Defendant Sands joined the Board of Directors in 1999 and is a current

member of the Board.  Defendant Sands was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

56.    Defendant Wesley M. Taylor ("Taylor") served as a Director of Arch Coal during the Class Period.  Defendant Taylor was appointed Chairman of the Board of Directors in April 2014 and currently serves in that position.  Defendant Taylor served as Lead Director from February 2013 to April 2014.  Defendant Taylor was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

57.    Defendant Peter I. Wold ("Wold") served as a Director of Arch Coal during the Class Period.  Defendant Wold joined the Board of Directors in 2010 and is a current member of the Board.  Defendant Wold was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

58.    Defendants Eaves, Lang, Boyd, Freudenthal, Godley, Hanrahan, Hunt, Jennings, Jones, Leer, Morris, Perry, Porter, Sabala, Sands, Taylor, and Wold are collectively referred to herein as the "Director Defendants."

**Finance Committee Defendants**

59.    Defendant Finance Committee had responsibility, for *inter alia*, reviewing and evaluating the Company's status and performance in the employee benefit area.  Its review was to include, at a minimum, "actuarial valuations, investment policies, individual investment

16

manager's performance, and internal retirement committee performance." *See* Finance Committee Charter, attached hereto as Exhibit A. Upon information and belief, members of the Finance Committee served at the pleasure of the full Board of Directors.

60.    Defendant Sands was a member of the Finance Committee during the Class Period. *See* http://investor.archcoal.com. Accordingly, Defendant Sands was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

61.    Defendant Eaves was a member of the Finance Committee during the Class Period. *See* http://investor.archcoal.com. Accordingly, Defendant Eaves was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

62.    Defendant Jones was a member of the Finance Committee during the Class Period. *See* http://investor.archcoal.com. Accordingly, Defendant Jones was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

63.    Defendant Morris was a member of the Finance Committee during the Class Period. *See* http://investor.archcoal.com. Accordingly, Defendant Morris was a fiduciary of the

Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

64.     Defendant Lang was a member of the Finance Committee during the Class Period.  *See* http://investor.archcoal.com.  Accordingly, Defendant Lang was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

65.     Defendant Sabala was a member of the Finance Committee during the Class Period.  *See* http://investor.archcoal.com.  Accordingly, Defendant Sabala was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

66.     Defendants Sands, Eaves, Jones, Morris, Lang, and Sabala are collectively referred to herein as the "Finance Committee Defendants."

### Plan Administrator Defendants

67.     As noted in the 2014 Form 11-K, the Company has "appointed the Vice President-Human Resources as the Plan Administrator."  2014 Form 11-K at 8.  *See also* 2013 Form 5500, Notes to Financial Statements at 9 (same).

68.     Defendant Allen R. Kelly ("Kelly") served as Vice President-Human Resources and Vice President-Enterprise Risk Management during the Class Period.  Defendant Kelly served as Vice President-Enterprise Risk Management from 2008 to March 2014, at which time he was appointed as Vice President-Human Resources.  Defendant Kelly signed the 2014 Form 11-K, 2013 Form 11-K,[5] and 2013 Form 5500 as Plan Administrator.  *See* 2014 Form 11-K at 21; 2013 Form 5500 at 1.  Defendant Kelly was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

69.     Defendant John Ziegler, Jr. ("Ziegler") served as Chief Commercial Officer and Vice President-Human Resources during the Class Period.  Defendant Ziegler served as Vice President-Human Resources from April 2012 to March 2014 at which time he was appointed Chief Commercial Officer.  Defendant Ziegler signed both the 2012 Form 11-K and 2012 Form 5500 as Plan Administrator.  *See* Arch Coal, Inc. Employee Thrift Plan 401(k) Plan Annual Report for Year-End 2012, at 19 (filed June 26, 2013) ("2012 Form 11-K"); 2012 Form 5500, at 1.  Defendant Ziegler was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets

70.     Defendants Kelly and Ziegler, as well as any other individual who served as Vice President-Human Resources and/or Plan Administrator during the Class Period are collectively referred to herein as the "Plan Administrator Defendants."

---

[5] Arch Coal, Inc. Employee Thrift Plan Annual Report for Year-End 2013 (filed June 26, 2014) ("2013 Form 11-K").

**Retirement Committee Defendants**

71.     As explained in the 2014 Form 11-K, the Company has "established a Retirement Committee to oversee the activities of the Plan."  2014 Form 11-K at 8.  *See also* 2013 Form 5500, Notes to Financial Statements at 9 (same).

72.     Upon information and belief, the Retirement Committee had the responsibility for selecting and monitoring the Plan's investment options.  *See also* 2014 Form 11-K at 1, Report of Independent Registered Public Accounting Firm letter addressed to The Retirement Committee, Arch Coal, Inc. Employee Thrift Plan.  Upon information and believe the Retirement Committee and its members[6] were fiduciaries of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

73.     Defendants Retirement Committee and all individual members of the Retirement Committee during the Class Period are collectively referred to herein as the "Retirement Committee Defendants.

**Trustee Defendant**

[6]   The entire composition of the Retirement Committee is not presently known to Plaintiff. During his investigation, Plaintiff requested pursuant to, ERISA § 104(b)(4), 29 C.F.R. § 2520.104b-1 that the Plan Administrator provide meeting minutes of the Retirement Committee in order to help identify all of the names of the members of the Retirement Committee.  Plaintiff believes that after a reasonable opportunity for discovery to obtain any committee charters, trust agreements, and other relevant information, the aforementioned documents will provide additional evidentiary support for the allegations set forth herein, including with respect to the composition of the Retirement Committee during the Class Period.  Indeed, while Plaintiff has identified the Defendant fiduciaries in the instant submission in accordance with the information he has obtained thus far, Plaintiff reserves the right to further amend during and after discovery, as determining the identity and full breadth of responsibilities of ERISA fiduciaries is an inherently fact-intensive effort.

74.     Defendant Mercer Fiduciary Trust Company ("Mercer") served as the Plan's Trustee, holding the Plan's assets in a trust.  *See* 2014 11-K at 8.  Mercer maintains an office at 701 Market Street, Suite 1100, St. Louis, MO 63101.

75.     Mercer was a fiduciary of the Plan because it exercised discretionary authority or control over the Plan's management and/or authority or control over management or disposition of the Plan's assets.  Pursuant to ERISA Section 403(a)(1), 29 U.S.C. § 1103(a)(1), as directed trustee, Mercer had a duyt to follow only "proper directions" that are "not contrary to ERISA."

### Additional "John Doe Defendants"

76.     To the extent that there are additional Company officers, directors, and employees who were fiduciaries of the Plan during the Class Period, including members of the Retirement Committee, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 1-10 include other individuals, including, but not limited to, Company officers, directors, and employees, who were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## THE PLAN

### Purpose of the Plan

77.     The Arch Coal Employee Thrift Plan June 2015 Expense and Investment Notice (the "June 2015 Plan Notice"), attached as Exhibit B, distributed/available to Plan Participants makes clear that the Plan's purpose is to help participants save for retirement.

78.     Specifically, the June 2015 Plan Notice notes "Saving for retirement is important for your financial future, whether you are retiring soon or years from now.  The ARCH COAL EMPLOYEE TRIFT PLAN (your 'Plan') is designed to assist you in meeting your retirement

goals." *See* June 2015 Plan Notice at 2.  The June 2015 Plan Notice further notes that the Plan

"is an important part of a secure financial future."  *Id.*

### Overview of the Plan

79.     The 2014 Form 11-K notes that the Plan "was established by Arch Coal, Inc. (the

Company) for the benefit of eligible employees of the Company, its subsidiaries and controlled

affiliates."  2014 Form 11-K at 4.

80.     "The Plan is a defined contribution plan that covers substantially all salaried

employees, nonunion hourly employees, and certain union employees where specified by

applicable collective bargaining agreements of the Company, its subsidiaries, and any controlled

affiliates that elect to participate in the Plan."  *Id.*

### Administration of the Plan

81.     As noted in the 2014 Form 11-K, the Company has "appointed the Vice

President-Human Resources as the Plan Administrator."  2014 Form 11-K at 8.  *See also* 2013

Form 5500, Notes to Financial Statements at 9 (same).

82.     The 2014 Form 11-K also notes the "Company established a Retirement

Committee to oversee the activities of the Plan."  2014 Form 11-K at 8.  *See also* 2013 Form

5500, Notes to Financial Statements at 9 (same).  Upon information and belief, the Retirement

Committee is responsible for the day-to-day operation of the Plan.  *See also* 2014 Form 11-K at

1, Report of Independent Registered Public Accounting Firm letter addressed to The Retirement

Committee, Arch Coal, Inc. Employee Thrift Plan.

### Eligibility in the Plan

83.     The Plan includes an automatic enrollment provision for all eligible employees.

*See* 2014 Form 11-K at 4.

84.    The automatic enrollment provides for default salary deferral contributions of 6% of eligible compensation, which will be invested in a target retirement fund.  *Id.*

**Contributions to the Plan**

85.    The Plan provides for both participant contributions and matching contributions from the Company.  *See* 2014 Form 11-K at 4.

86.    Participants may elect to defer between 1% and 50% of their compensation.  *Id.* at 4.

87.    With respect to Company matching contributions, the Company is required to make matching contributions to all participants equal to 100% of the participant salary deferral contributions up to the first 6% of eligible compensation.  *Id.*  This is true for all Plan participants with the exception of participants who are hourly eligible employees of Mountain Laurel,[7] who instead receive a fixed 8% of employer contributions.  *Id.*

88.    The Plan also provides for the possibility of Company discretionary contributions, including such contributions in the discussion of participants' accounts.  *See* 2014 Form 11-K at 5.  Specifically, the 2014 Form 11-K notes that each participant's accounts is credited with the participant's salary deferral and rollover contributions, the Company's matching contributions, and Company discretionary contributions, if applicable, and an allocation on Plan earnings.  *Id.*

**Vesting of Contributions in the Plan**

89.    Participants are fully vested in their salary deferral and rollover contributions plus actual earnings.  *See* 2014 Form 11-K at 5.

---

[7]  Mountain Laurel is one of the mines owned and operated by Arch Coal, located in in the Central Appalachia Region in Sharples, West Virginia.

90.     All eligible employees of the Company as of December 31, 1997, became fully vested in the Plan.  *Id.*  Eligible employees hired subsequent to December 31, 1997 vest in Company contributions and earnings upon the completion of three fully years of service.  *Id.*

91.     The hourly employees at Mountain Laurel are fully vested after the completion of two full years of service.  *Id.*

92.     Former participants in the International Coal Group, Inc. 401(k) Savings and Retirement Plan (which merged with the Plan as of January 1, 2012) are 20% vested after the completion of one year of service, 40% vested after the completion of two years of service, and 100% vested after the completion of three years of service.  *Id.*

**Investment Options in the Plan**

93.     Upon enrollment in the Plan, a participant may direct contributions in a number of investment options offered by the Plan.  *See* 2014 Form 11-K at 6.

94.     The June 2015 Plan Notice states "Arch Coal Company Stock is an available investment option under your Plan."  June 2015 Plan Notice at 5.

95.     The 2014 Form 11-K lists the Plan's investment options for December 31, 2013 and December 31, 2014.  *See* 2014 Form 11-K at 9.  The investment options fall into five categories – Mutual Funds, Stable Value Fund, Company Stock, Collective Trust Funds, and Brokerage Securities.  *See id.*  As of December 31, 2012 and December 31, 2013 there were twelve mutual fund options and twelve collective trust fund options in the Plan in addition to the Stable Value Fund, Brokerage Securities, and Company Stock.  2013 Form 11-K at 8.  As of December 31, 2014, there were nine mutual fund options and eleven collective trust fund options in the Plan in addition to the Stable Value Fund, Brokerage Securities, and Company Stock.  2014 Form 11-K at 9.

**Arch Coal Stock in the Plan**

96.    The Plan notes that Company Stock is valued at the closing price reported on the active market on which the individual securities are traded.  *See* 2014 Form 11-K at 13.  *See also* June 2015 Plan Notice at 5 ("The value of Arch Coal Company Stock is calculated based on market transactions during the day based on procedures established for your Plan.").

97.    The value of the Arch Coal in the Plan has diminished significantly leading up to the start of the Class Period and has continued its significant decline during the Class Period. The June 2015 Plan Notice informs that the Arch Coal Stock one year, five year, ten year, and since inception performance as of year-end 2014 is negative across the board:

| Stock Performance | 1 year | 5 year | 10 year | Since inception |
|---|---|---|---|---|
| Arch Coal Company Stock (ACI) | -59.90% | -38.61% | -19.47% | -2.57% |

*See* June 2015 Plan Notice at 12.

98.    Specifically, as of December 31, 2012, the Plan had $23,324,416 in Company Stock.  *See* 2013 Form 11-K at 2.  As of December 31, 2013, the Plan had $17,580,458 in Company Stock, a 24.6% decline, losing more than $5.7 million dollars.  Based on the Arch Coal Stock price of $4.44 as of December 31, 2013, the number of Arch Coal shares in the Plan as of year-end 2013 was approximately 3,959,562.61.

99.    As reported in the 2014 Form 11-K, as of December 31, 2013, the Plan had $17,580,458 in Company Stock.  *See* 2014 Form 11-K at 2.  As of December 31, 2014, the Plan had $8,169,449 in Company Stock, a $9.4 million loss, or a loss of more than 50% in just one year.  *Id.*

100.    Based on the Arch Coal Stock price of $1.78 as of December 31, 2014, the number of Arch Coal shares in the Plan as of year-end 2014 was approximately 4,589,578.09.

Assuming the Plan has not purchased additional shares of Arch Coal Stock since year-end December 31, 2014, the value of Arch Coal Stock as of the filing of the instant complaint would be roughly $1,927,622.80 based on Arch Coal Stock price of $0.42 as of June 29, 2015.  Thus, the value of the Arch Coal Stock in the Plan is worth just a fraction of its value from the start of the Class Period.

**Plan Fiduciaries Are Bound by ERISA's Strict Standards**

101.    Despite the Plan's substantial investment in Arch Coal Stock, Defendants failed to protect the Plan and its Participants from the decline in value of the Arch Coal Stock resulting from the Company's deteriorating financial condition.

102.    Fiduciaries of retirement plans such as the Plan here are bound by core ERISA fiduciary duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing retirement benefits to plan participants.  This is true regardless of the structure of a plan.

103.    Accordingly, if the fiduciaries of the Plan knew, or if an adequate investigation would have revealed, that Company Stock was no longer a prudent investment for the Plan, then the fiduciaries had the obligation to disregard any purported Plan directions to maintain investments in Company Stock and protect the Plan by investing the Plan's assets in other, suitable, prudent investments.

**CLASS ACTION ALLEGATIONS**

104.    Plaintiff brings this action derivatively on the Plan's behalf pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, and as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plan, Plaintiff, and the following class of similarly situated persons (the "Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan at any time between July 27, 2012 and the present (the "Class Period")[8] and whose Plan accounts included investments in Arch Coal Stock.

105.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of employees of the Plan who participated in, or were beneficiaries of, the Plan during the Class Period and whose Plan accounts included investment in Arch Coal Stock.

106.    For example, in 2012, there were 5,520 participants in the Plan.  *See* 2012 Plan Form 5500 filed with the Department of Treasury Internal Revenue Service and the Department of Labor.  In 2013, the number of participants in the Plan was 7,863.  *See* 2013 Plan Form 5500 filed with the Department of Treasury Internal Revenue Service and the Department of Labor.

107.    At least one common question of law or fact exists as to Plaintiff and all members of the Class.  Indeed, multiple questions of law and fact common to the Class exist, including, but not limited to:

(a)     whether Defendants each owed a fiduciary duty to the Plan, Plaintiff, and members of the Class;

(b)     whether Defendants breached their fiduciary duties to the Plan, Plaintiff, and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

(c)     whether Defendants violated ERISA; and

---

[8]  Plaintiff reserves the right to modify the Class Period definition in the event that further investigation/discovery reveals a more appropriate and/or broader time period during which Arch Coal Stock was an imprudent investment option for the Plan.

(d) whether the Plan, Plaintiff, and members of the Class have sustained damages and, if so, what is the proper measure of damages.

108. Plaintiff's claims are typical of the claims of the members of the Class because the Plan, Plaintiff, and the other members of the Class each sustained damages arising out of Defendants' uniform wrongful conduct in violation of ERISA as complained of herein.

109. Plaintiff will fairly and adequately protect the interests of the Plan and members of the Class because they have no interests antagonistic to or in conflict with those of the Plan or the Class.  In addition, Plaintiff has retained counsel competent and experienced in class action litigation, complex litigation, and ERISA litigation.

110. Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

111. Class action status is also warranted under Rule 23(b)(1)(A) and (b)(2) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

**DEFENDANTS' FIDUCIARY STATUS**

112. ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

113.    ERISA treats as fiduciaries persons explicitly named as fiduciaries under §
402(a)(1), 29 U.S.C. § 1102(a)(1), and any other persons who in fact perform fiduciary functions
(*e.g.*, *de facto* or functional fiduciaries).  Thus, a person acts as an ERISA fiduciary to the extent
"(i) he exercises any discretionary authority or discretionary control respecting management of
such plan or exercises any authority or control respecting management or disposition of its
assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with
respect to any moneys or other property of such plan, or has any authority or responsibility to do
so, or (iii) he has any discretionary authority or discretionary responsibility in the administration
of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

114.    During the Class Period, upon information and belief, each of the Defendants was
a fiduciary – *i.e.*, either a named fiduciary or a *de facto* fiduciary – with respect to the Plan and
owed fiduciary duties to the Plan and its Participants under ERISA.  As fiduciaries, Defendants
were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan,
and the Plan's investments, solely in the interest of the Plan's Participants and with the care,
skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting
in a like capacity and familiar with such matters would use in the conduct of an enterprise of a
like character and with like aims.

115.    Plaintiff does not allege that each Defendant was a fiduciary with respect to all
aspects of the Plan's management, administration, and assets.  Rather, as set forth below,
Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority for
Plan management and authority assigned to or exercised by each of them and/or the specific
exercise of authority or control over Plan assets by each of them, and, as further set forth below,

the claims against each Defendant are based on such specific discretion and authority and/or exercise of authority or control.

116.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, upon information and belief, the Company chose to assign the appointment and removal of fiduciaries, such as the members of the Retirement Committee, to itself.

117.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions occurring, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan's sponsor(s).

118.     During the Class Period, all of Defendants acted as fiduciaries of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

**The Company and Director Defendants' Fiduciary Status**

119.     Instead of delegating fiduciary responsibility for the Plan to external service providers, Arch Coal chose to internalize certain vital fiduciary functions.

120.     As the 2014 Form 11-K notes, Arch Coal established the Plan for the benefit of the eligible employees of the Company, its subsidiaries and controlled affiliates. *See* 2014 Form 11-K at 4.  Further, Arch Coal is identified as the Plan Sponsor on the Plan's 2011, 2012, and 2013 Forms 5500.

121.     At all times, Arch Coal acted through its directors, officers, and employees, including the Director Defendants, who performed Plan-related fiduciary functions in the course and scope of their employment.  Arch Coal had, at all applicable times, effective control over the activities of its officers and employees, including their Plan-related activities.  Through its Board of Directors or otherwise, Arch Coal had the authority and discretion to hire and terminate said directors, officers, and employees.  Additionally, by failing to properly discharge their fiduciary

30

duties under ERISA, the directors, officers, and employee fiduciaries breached duties they owed to the Plan's Participants.

122.    Accordingly, the actions of the Director Defendants and other employee fiduciaries are imputed to Arch Coal under the doctrine of *respondeat superior*, and Arch Coal is liable for these actions.

### The Finance Defendant's Fiduciary Status

123.    As noted *supra*, Defendant Finance Committee had responsibility, for *inter alia*, reviewing and evaluating the Company's status and performance in the employee benefit area. Its review was to include, at a minimum, "actuarial valuations, investment policies, individual investment manager's performance, and internal retirement committee performance."   *See* Exhibit A.

124.    Accordingly, the Finance Defendants were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority to appoint and monitor Plan fiduciaries who had discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

### The Plan Administrator Defendants' Fiduciary Status

125.    As explained in the 2014 Form 11-K, the Company has "appointed the Vice President-Human Resources as the Plan Administrator."  2014 Form 11-K at 8.  *See also* 2013 Form 5500, Notes to Financial Statements at 9 (same).

126.    Defendants Kelly and Ziegler both served as Vice President-Human Resources during portions of the Class Period, and signed the Forms 11-K and 5500 on behalf of the Plan as Plan Administrator.  *See* 2014 Form 11-K at 21, 2013 Form 11-K at 20, and 2013 Form 5500 at 1

signed by Defendant Kelly; 2012 Form 11-K at 19 and 2012 Form 5500 at 1 signed by Defendant Ziegler.

127.    The Plan Administrator Defendants were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

**The Retirement Committee's Fiduciary Status**

128.    Upon information and belief, the Company officers/employees who comprised the Retirement Committee were appointed by the Board and/or the Finance Committee and were delegated the day-to-day responsibility for the administration of the Plan and the Plan's assets. *See, e.g.*, 2014 Form 11-K at 8 (noting the Company has "established a Retirement Committee to oversee the activities of the Plan"); 2013 Form 5500, Notes to Financial Statements at 9 (same).

129.    Upon information and belief, the Retirement Committee had the responsibility for selecting and monitoring the Plan's investment options.  *See also* 2014 Form 11-K at 1, Report of Independent Registered Public Accounting Firm letter addressed to The Retirement Committee, Arch Coal, Inc. Employee Thrift Plan.

130.    Thus, the Retirement Committee and its members were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

**The Trustee's Fiduciary Status**

131.    A directed trustee cannot blindly follow directions of other fiduciaries; it is an ERISA fiduciary and has a duty to "supervise" and "investigate" the directions it receives from a plan's named fiduciary when it has "some reason to know" that the directions may conflict with

ERISA or a plan's terms.  Pursuant to ERISA Section 403(a)(1), 29 U.S.C. § 1103(a)(1), a directed trustee may only follow "proper directions" that are "not contrary to ERISA."

132.    Because during the Class Period Mercer knew or should have known that Arch Coal was in dire straits, was an unreasonably risky retirement investment, and had a very high probability of bankruptcy, it had a fiduciary duty to protect the Plan and its Participants from the continued imprudent investment in Arch Coal Stock.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

133.    As the Plan's fiduciaries, Defendants knew or should have known certain basic facts about the characteristics and behavior of the Plan's Participants, well-recognized in the 401(k) literature and the trade press[9] concerning investment in company stock, including that:

    (a)    Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

    (b)    Out of loyalty, employees tend to invest in company stock;

    (c)    Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

---

[9]  *See, e.g.*, David K. Randall, *Danger in Your 401(k)*, Forbes.com (August 30, 2010), *available at*: www.forbes.com/forbes/2010/0830/health-retirement-savings-erisa-danger-in-401k_print.html); Liz Pulliam Weston, *7 Ways to Mess Up Your 401(k)*, MSN.com (December 31, 2007), *available at*: articles.moneycentral.msn.com/RetirementandWills/InvestForRetirement/7MostCommon401kBl unders.aspx); Joanne Sammer, *Managed Accounts: A new direction for 401(k) plans*, Journal of Accountancy, Vol. 204, No. 2 (August 2007), *available at*: www.aicpa.org/pubs/jofa/aug2007/sammer.htm); Roland Jones, *How Americans Mess Up Their 401(k)s*, MSNBC.com (June 20, 2006), available at: www.msnbc.msn.com/id/12976549/); Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001), *available at*: mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plan - the importance of plan design*, Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.), *available at*: www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

(d)     Employees tend not to change their investment option allocations in the plan once made;

(e)     No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(f)     Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(g)     Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with its rewards.

134.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the substantial investment of the Plan's funds in Company Stock, they still took no action to protect the Plan's assets from its imprudent investment in Company Stock.

**FACTS BEARING UPON DEFENDANTS' FIDUCIARY BREACHES**

**Overview**

135.     In July 1997, the Arch Mineral Corporation merged with Ashland Coal, Inc. to become Arch Coal Incorporated, one of the largest producers of low-sulfur coal in the United States.  *See* 2014 Form 10-K at 5.  Arch Coal is one of the largest coal producers in the world with 16 active mines located in the United States.  *Id.*  Arch Coal, "sell[s] substantially all of [its] coal to power plants, steel mills and industrial facilities.  *Id.*

136.    Arch Coal's success is heavily reliant on high coal prices and strong demand for coal.  Based on this criteria, the last several years have been disastrous for Arch Coal specifically, and the coal industry in general, with no respite in the foreseeable future.  Summed

up, "[p]rices have been sliding (see chart [below]), political opposition growing and demand

dropping.  The Dow Jones Total Coal Market index has fallen by 76%  in the past five years."



*See Coal Mining, In the Depths*, The Economist, Mar. 28, 2015 at 65.

137.    Worldwide, "the tide is turning against coal."  *See Coal Mining, In the Depths*,

The Economist, Mar. 28, 2015 at 65.  In America, coal use peaked in 2007.  *Id.*  One of the

reasons is that in the United States, "coal now struggles to compete with natural gas, which has

fallen 80% in price since 2008."  *Id.*  Other coal industry experts have similarly opined that "the

industry faces something historic – persistently low natural gas prices – a reality that caps the

level of potential price improvement in U.S. coal markets."  *See Weak 2014 Numbers Worsen An*

*Already Bad Outlook For Coal Companies*, Institute for Energy Economics and Financial

Analysis, Feb. 2, 2015 at 1, available at http://ieefa.org/weak-2014-numbers-worsen-already-

bad-outlook-coal-companies/.

138.     This downturn for the coal industry is not simply a temporary blip.  "The fear now is of a structural shift" in which coal is phased out.  *Coal Mining, In the Depths*, The Economist, Mar. 28, 2015 at 65.  The Economist predicts "new coal-mining investments would risk becoming stranded assets, and older deep mines would be even more uneconomic than now." *Id.*  According to the Economist, "Carbon Tracker, a non-profit group, reckons that more than $100 billion worth of planned capital spending risks being stranded by 2035.  A prospect as black as a miner's lungs." *Id.*

139.     The fact is that the "U.S. coal industry has decoupled from the broader, gradually recovering economy and its spiral has deepened."  *See Weak 2014 Numbers Worsen An Already Bad Outlook For Coal Companies*, Institute for Energy Economics and Financial Analysis, Feb. 2, 2015 at 1, available at http://ieefa.org/weak-2014-numbers-worsen-already-bad-outlook-coal-companies/.  It appears that "more pragmatic leaders and champions of the industry acknowledge the severity of its financial conditions, and have conceded a reality that is more in line with analysts who see weak prices through 2015 – and then little upside potential thereafter." *Id.*

140.     Predictably, the severe and historic downturn of the coal industry has devastated Arch Coal's financials.  For full-year 2012, Arch Coal reported a staggering net income loss of $683,955,000; for full-year 2013, it reported a net income loss of $641,832,000, and for full-year 2014, it reported a net income loss of $558,353,000.

141.     The Company's financial condition, when viewed through the lens of objective financial metrics, plainly indicates the Company's deterioration over the last several years.  Not surprisingly, the Company's stock price reflects the struggling company's condition.  Arch Coal's stock price reached its highest peak on June 1, 2008 at $75.03 per share.  The next highest

peak was $36.04 on March 1, 2011.  The Company has seen its share price steadily decline ever since.

142.    In light of the Company's diminished financial prospects, resulting in a dramatic shift in the Company's basic risk profile, Arch Coal Stock was not a prudent Plan investment option during the Class Period.  The Plan's fiduciaries knew or should have known this fact and should have taken steps to protect the Plan and its Participants.  Sadly though, as set forth below, the Defendant-fiduciaries did nothing while the retirement savings of the Plan's Participants simply evaporated as a result of these inactions.

**The Colossal Collapse of the Coal Industry**

143.    Modern coal use around the world is largely divided into two types: thermal coal, used for the production of electric power generation whether by power plants or industries producing and consuming their own power, and metallurgical coal, which is used by industries in the production of other materials, such as iron and steel.  *See The Coal Facts: thermal coal vs. metallurgical coal*, Global News, June 10, 2013, available at http://globalnews.ca/news/627069/the-coal-facts-thermal-coal-vs-metallurgical-coal/.

144.    Beginning in 2007, certain obstacles to the U.S. coal industry's continued growth started to become apparent.  In that year, coal plants had severely slowed production, reducing their use from between 50 and 80% capacity on average to less than 30% on average.  This is in addition to the number of coal plants which either had or were scheduled to be completely retired.  *See Bank of America and Citigroup Biggest Lenders to Coal*, Bloomberg Business, Apr. 29, 2013, available at http://www.bloomberg.com/news/articles/2013-04-29/bank-of-america-and-citigroup-biggest-lenders-to-coal.

145.    By the end of 2007, in addition to increased pressure from the natural gas market as a competitor to thermal coal, regulatory uncertainty about increased emissions standards had

"stalled plans for many new coal plant builds," needed to replace aging plants which were due to be retired.  *See Fitch: Regulatory Challenges and Beneficial Fundamentals for U.S. Coal Industry*, Business Wire, Dec. 19, 2007 at 1.  While U.S. electric consumption was growing, certain coal-plants were aging and due for retirement, and industry uses and exports were expected to remain flat.  "As a result, the US coal industry's fortunes are inextricably linked with the development of new U.S. coal-fired plants."  *See Uphill struggle for new US coal plant*, Platts Energy Economist, Aug. 1, 2008 at 1.

146.    In 2008, the Dow Jones U.S. Coal Index hit a high of 700.  This was driven in large part by strong demand for metallurgical coal in the developing world, including China and India.  As a result, a number of coal companies whose core business was thermal coal acquired metallurgical coal companies in an attempt to diversify via debt-heavy deals.  *See Are coal stocks ready to make a comeback?*,  CNBC,  Jul.  9,  2014,  available  at http://www.cnbc.com/id/101816298.  The 2008 high is in stark contrast to today's Dow Jones U.S. Coal Index which stands below 100.

147.    By 2012, there was a marked decline in U.S. coal demand.  In April 2012, Moody's forecast "permanent shifts" in the energy sector, as "depressed natural gas prices continue to put pressure on the goal generation sector."  *See Moody's foresees permanent shifts in energy sector over next decade*, SNL Power Week (Canada), Apr. 9, 2012 at 1.

148.    On June 26, 2012, the U.S. Energy Information Administration ("EIA") predicted continuing U.S. coal production declines through 2015.  *See Annual Energy Outlook 2012*, U.S. Energy Information Administration, Jun. 25, 2012 at 98.  Long term, the outlook for coal was similarly poor:

> Over the next 25 years, the share of electricity generation from coal falls to 38 percent, well below the 48-percent share seen as

> recently as 2008, due to slow growth in electricity demand, increased competition from natural gas and renewable generation, and the need to comply with new environmental regulations.

*Id*. at 4.

149.    On July 13, 2012, the EIA released the results of a study about competition between coal, natural gas and petroleum in the energy generation sector which clearly showed the decline of coal as a fuel for energy production in the face of natural gas competition.  Noting that coal's share of power generation historically "varied in response to changes in the cost and availability of competing fuels," the EIA cited the lower cost of natural gas as well as a 96% growth of natural gas generating capacity between 2002 and 2012 as key factors in coal's declining use as illustrated by this chart:



*See Competition among fuels for power generation driven by changes in fuel prices*, EIA, July 13, 2012, available at http://www.eia.gov/todayinenergy/detail.cfm?id=7090.

150.    In late July 2012, the EIA announced that plant owners and operators were planning to retire 8.5% of the total 2011 coal-fired plant capacity.  *See 27 gigawatts of coal-fired capacity to retire over next five years*, EIA, July 27, 2012, available at http://www.eia.gov/todayinenergy/detail.cfm?id=7290.   This was more than four times the number of retirements of the preceding five year period:



*Id.*

151.    The EIA also predicted that coal would not recapture its 45% share of the power generation market over the next 25 years.  *See Fuel used in electricity generation is projected to shift over the next 25 years*, EIA, July 30, 2012, available at http://www.eia.gov/todayinenergy/detail.cfm?id=7310.  In fact, coal's share of power generation, already historically low, was predicted fall to fall 38% over the next quarter century.  *Id.*

152.    In keeping with projections, in August 2012, the EIA released the results of a survey of new electric capacity additions by fuel source, showing that new coal-plants were being far outpaced by natural gas and wind-plants:



*See Natural gas, renewables dominate electric capacity additions in the first half of 2012*, EIA, Aug. 20, 2012, available at http://www.eia.gov/todayinenergy/detail.cfm?id=7610.

153.    By September 2012, Moody's had already seen that any growth in exports for the U.S. coal industry would be insufficient to offset domestic declines.  *See Moody's: Growing export opportunities for US coal industry insufficient to offset domestic declines*, Moody's Investors Service, Sep. 14, 2012 at 1.  The industry "is going through a long-term shift in market fundamentals, pressured by abundant, cheap natural gas and ever-stringent environmental regulations, and has shrunk coal's share of the US power market by over 10% in the last four years."  *Id*.

154.    The situation was clear by the fall of 2012:

> Once mighty, the US coal industry's domestic market appears to be in **terminal decline**.  New power generation is made up almost entirely of natural gas plant or renewable energy sources.  Old coal

plant closures as being hastened by environmental regulation.  In the face of shale gas, coal no longer seems cheap.  On a variety of fronts, coal has been left standing on the starting line, outpaced by innovation in other sectors of the energy world.

*See US Coal in decline*, Platts Energy Economist, Oct. 1, 2012 at 1 (emphasis added).

155.    Coal exports to Canada were also expected to continue their decline, begun in 2007, as depicted in the below chart:



*See Canada Week: Canada is a declining market for U.S.* coal, EIA, Nov. 29, 2012, available at http://www.eia.gov/todayinenergy/detail.cfm?id=8970.  This was the result of Canadian policies aimed at reducing coal-fired electric generation as contributors of greenhouse gases.  *Id.*

156.    Long-term prospects for exports to Europe were also dim.  With nearly half of U.S. exports headed to European coal-fired power plants, Laszlo Varro, head of gas, coal and power markets for the International Energy Agency ("IEA") stated that, "regulations in Europe will eventually lead to a substantial decommissioning of coal-fired generation capacity outside of Germany, similar to what is happening in the U.S. now."  *See IEA head: European coal renaissance 'not going to be permanent'*, SNL Daily Gas Report, Jan. 28, 2013 at 1.  Varro also expressed doubt that the U.S. industry would be a strong competitor for Chinese and Indian

markets, with Indonesia being a closer low-cost supplier and China improving its railroad infrastructure to move coal from its own mines to power plants. *Id*. at 2.

**Leading to the Start of the Class Period, Numerous Red Flags Warned of the Imprudence of Arch Coal Stock as an Investment Option for the Plan**

157.    In addition to the above objective indicia that the coal industry was undergoing a historic downturn that would last for the foreseeable future, other objective factors demonstrated the imprudence of investing retirement savings in Arch Coal Stock.

158.    For example, on June 15, 2011, Arch Coal completed its acquisition of International Coal Group (or ICG) for $3.4 billion. *See* Mayur Sontakke, "Understanding Arch Coal's Acquisition of International Coal Group," *www.marketrealist.com*, December 3, 2014. "The acquisition helped the company expand its metallurgical ["met"] coal portfolio significantly." *Id*.

159.    However, the acquisition of ICG would prove to be a financial albatross for Arch Coal. "Soon after the acquisition, met coal prices dropped." *Id.* For perspective, in the second quarter of 2011, a ton of met coal cost $330. *See* Paul Ausick, *Can US Coal Miners Dodge the Bankruptcy Bullet?*, *24/7 Wall St.*, available at http://247wallst.com/energy-business/2015/06/17/can-us-coal-miners-dodge-the-bankruptcy-bullet/. "In the first quarter of 2015, that same ton of met coal cost an average of $117." *Id.* In the second quarter of 2015, the price of met coal was $95 per ton. *Id*.

160.    At the time of the ICG acquisition, the Company had expected to ship 15 million tons of met coal by the end of 2012 (compared to a shipment of 7.4 million tons in 2011). However, with a drop in prices and oversupply in the market, the company could ship just half of it (7.5 million tons) during the year." *Id*.

161.    Further, Arch Coal's debt jumped from $1.5 billion before the ICG acquisition to $3.7 billion by the end of 2011 after the acquisition.  *Id*.  Additionally, at the time of the completion of Arch's acquisition of ICG, its stock price closed at $25.10, by the end of the year Arch's stock had fallen 42% to $14.51.  *Marketwatck.com*.

162.    There was additional evidence of the Company's precarious financial condition. The Altman Z-Score ("Z-Score"), developed in 1968 by Professor Edward Altman of the Stern School of Business at New York University, is a bankruptcy prediction model commonly accepted and used by financial analysts.  *See National Wildlife Federation v. EPA*, 286 F.3d 554, 565-66 (D.C. Cir. 2002) (upholding Federal agency's use of Altman Z-Score analysis for predicting likelihood of bankruptcy and accepting that it "has been quite accurate over these last 25 years and remains an objective, established tool") (internal quotes and citations omitted).

163.    A Z-Score greater than 2.99 is the "safe zone" meaning a company is unlikely to go bankrupt, a score of 1.88 to 2.99 is the "grey zone," and a score less than 1.88 is the "distress zone" where there is a high probability the company will go bankrupt within two years.

164.     By March 31, 2012, Arch Coal's Z-Score was well within the distress zone at .90.  The Company's debt-to equity ratio stood at 1.26 but was rapidly increasing.

165.    Standard & Poor's Ratings Services on April 25, 2012,  put credit ratings for Arch Coal "on Credit –Watch with negative implications because of 'very difficult' operating conditions for coal producers."  *See* Dan Lowrey, "S&P Puts Arch on Credit Watch Negative, Citing 'Very Difficult' Coal Market Conditions," *SNL Daily Coal Report*, April 26, 2012.  James Fielding noted that, "Operating conditions for domestic producers of thermal coal and to a lesser extent, metallurgical coal remain very difficult due to a mild winter, natural gas substitution in the U.S., and slowing steel production overseas.  In our view, these conditions are likely to

decrease demand and hurt contract pricing into 2013." *Id*. "**Arch has acknowledged that coal producers are facing significant headwinds in 2012**, including the possibility of a significant reduction in coal demand from electric utilities." *Id*. (emphasis added).

166.    Other red flags indicating the Company's deteriorating financial condition were apparent. On May 1, 2012, Arch Coal reported its financial results for the first quarter of 2012, ending March 31, 2012. As reported therein, the Company had a net income of $1.4 million compared to a $55.8 million net income for the previous quarter, a **97.5%** drop. *See* May 10, 2012 Form 10-Q at 4.

167.    After Arch Coal's stock dropped 7.4% on May 22, 2012, it was reported that, "**there seems to be no reprieve in sight for coal companies**, according to the U.S. Energy Information Administration, which estimated that electric power coal consumption would decline by about 10% this year while electricity generation from natural gas is expected to increase by about 16%." *See* Amir Kurtovic, "Big Chill for Coal Stocks: Peabody, Arch, Patriot Shares Hit New lows, Lose $16.5 Billion in Market Capital," *St. Louis Business Journal*, May 25, 2012 (emphasis added). Meredith Bandy, VP of coal equity research for BMO Capital Markets stated, "**There is a possibility that we won't see any improvement for the coal industry in the near future**." *Id*. (emphasis added).

168.    An analysis done by the energy research firm Doyle Trading Consultants identified Arch Coal "**as the coal supplier[] that could be the most vulnerable to looming coal unit retirements**." *See* Michael Niven, "Study: Arch, Peabody, Alpha Producers Most Vulnerable to Coal Unit Retirements," *SNL Daily Coal Report*, May 21, 2012 (emphasis added). The study, "examined a portfolio of 243 GW [gigawatt] of coal-fired generating capacity in the United States." *Id*. "Of the 243 GW of coal capacity analyzed by DTC, the firm found that

approximately 41.1 GW of generation has been announced to be retired by 2020 or is vulnerable to retirement by then…The firm expects roughly 90% of the 41.1 GW to be retired by 2015, pushed by the need to comply with the U.S. EPA's looming Mercury and Air Toxics Standards." *Id.* As of 2010, Arch supplied more than 25 million tons of coal to the vulnerable plants, topping the list as the company supplying the most coal to vulnerable plants. *Id.*

169.     On June 21, 2012, Arch Coal stated "that it will cut about 750 full-time employees, or about a tenth of its workforce, as it closes three higher-cost thermal mining complexes and temporarily idles or curtails production at several others in Appalachia." *See* Diana Barr, "Arch Coal Cutting 750 Workers, Idling 3 Mines," *St. Louis Business Journal,* June 21, 2012. "The company said the moves are prompted by, 'the unprecedented downturn in demand for coal-based electricity.'" *Id*. Arch Coal's President and CEO, John Eaves, said, "Current market pressures and a challenging regulatory environment have pushed coal consumption in the United States to a 20-year low." *Id*.

170.     As of June 30, 2012, Arch Coal's likelihood of bankruptcy had increased even further as its Z-Score moved even further into the distress zone with a score of .59.

171.     Probably the most eye-popping red flag was the incredible wave of bankruptcy filings by U.S. coal producers that began in 2012 and continued into 2013, in the wake of calls that 2013 would see "trough" pricing of coal. *See Bankruptcy filings by US coal companies accelerate as markets flounder*, SNL Daily Coal Report, Mar. 1, 2013 at 1. Facing slower economic growth in countries such as China, thus decreasing demand for metallurgical coal, and competition from shale gas and stricter environmental regulations hitting thermal coal, the downturn appeared "more chronic" rather than cyclical. *Id*. Coal-fired plants, too costly to retrofit with better pollution control technology in the face of cheap natural gas, were forced to

close, which lead to lower demand for coal especially from Central Appalachian producers.  The largest company to file was Patriot Coal Corporation ("Patriot Coal") on July 9, 2012, with assets of nearly $4 billion.  *Id.*

172.    Patriot Coal's bankruptcy is of particular relevance to the Defendants' breach of fiduciary duty to the Plan and its Participants.  Defendants were well aware of Patriot Coal because in 2008 Patriot Coal bought Magnum Coal which was a spinoff from Arch Coal.  *See* Clement Daly, *US Miners' Union Reaches Settlement With Patriot Coal and Peabody Energy*, Oct. 15, 2013, available at  https://www.wsws.org/en/articles/2013/10/15/patr-015.html.   Arch Coal would later be embroiled in litigation with employees of Patriot Coal who accused Arch Coal of spinning off its failing mines (*i.e.,* Magnum Coal) to avoid having to pay pensions and long-term health care obligations.  *See* Darren Epps, "UMWA points finger at Peabody, Arch for Patriot Bankruptcy," *SNL Daily Coal Report*, August 30, 2012.[10]

173.    Like Arch Coal, Patriot Coal sponsored a defined contribution plan.  Prior to June 28, 2012, the Patriot Coal plan invested in common stock of Patriot Coal through the Patriot Coal Stock Fund.  The Patriot Coal plan fiduciaries, who were operating with a similar backdrop of dire circumstances as Defendant-fiduciaries are today, appointed an independent fiduciary on June 21, 2012 (prior to filing for bankruptcy) to oversee the Patriot Coal Stock Fund.  *See* Patriot Coal 2012 Form 5500, Notes to Financial Statements For the Years Ended December 31, 2012 and 2011 at 7.  Upon information and belief, the Defendant-fiduciaries here have not even taken such a minimal step toward protecting the Plan and its Participants.  This is just another example of the Company's disregard for the long-term savings and financial future of its employees.

---

[10]  Arch Coal and the employees eventually "reached a $12 million deal to settle [the] legal issues."   *See* Taylor Kuykendall, "UMWA, Arch Coal Settle for $12 Over Retirement Obligations Related to Patriot," *SNL Daily Coal Report*, Feb. 5, 2014.

174.     Significantly, "[b]ased on a number of considerations, the independent fiduciary determined that it was in the best interest of Plan participants and beneficiaries to stop purchasing Patriot Coal Stock under the Plan and to sell all shares of Patriot Coal held in the Patriot Coal Stock Fund.  On June 28, 2012, all of the shares were sold and participants can no longer invest in Patriot Coal Stock through the Plan."  *See* Patriot Coal 2012 Form 5500, Notes to Financial Statements For the Years Ended December 31, 2012 and 2011 at 7.

175.     The action taken by the Patriot Coal plan fiduciaries along with the numerous other bankruptcy filings by coal companies in 2012 should have alerted the Defendant-fiduciaries to take steps to protect the assets of the Plan and its Participants invested in Arch Coal Stock.  This is especially so when considering that during this time period, as noted above, Arch Coal remained at serious risk of bankruptcy as measured by its Z-Score.

176.     On July 27, 2012, Arch Coal reported its financial results for the second quarter of 2012, ending June 30, 2012.  As reported therein, the Company had a net loss of $435.4 million compared to a profit of $1.4 million the previous quarter.  *See* August 9, 2012 Form 10-Q at 4.  Further, earnings per share were a loss of $2.05 per share for the quarter.  *Id* at 3.  The Company's liabilities increased $187 million to over $6.8 billion since the start of the year,  *id*. at 5, and Arch Coal's long term debt had risen nearly 19% since year-end 2011 to $4.46 billion.  *Id* at 7.

177.     Trust law states that "if the trustee holds property which when acquired by him was a proper investment, but which thereafter becomes an investment which would not be a proper investment for the trustee to make, it becomes the duty of the trustee to the beneficiary to dispose of the property within a ***reasonable time***."  *See* Restatement (Second) of Trusts § 231 (1959) (emphasis added); *see also* discussion *supra* Introduction.

178.    The Class Period begins on July 27, 2012, because by this point in time, at the time of the announcement of the disastrous second quarter results, a sufficiently reasonable amount of time had elapsed for the Plan's fiduciaries to take action to protect the Plan given the numerous red flags regarding the Company's precarious financial position in the preceding months.  Among other things, as noted above, just a month earlier on June 21st, the Company implemented a work-force reduction citing an ***unprecedented downturn*** in the coal industry and around the same time, the Patriot Coal plan fiduciaries had ceased investment of the Patriot Coal plan assets in Patriot Coal stock due in part to the dismissal future for coal.

179.    These and the plethora of other red flags described above made clear that Arch Coal Stock was not a prudent investment option for retirement savings.  On July 27, 2012, the Company Stock was trading at $6.55, which was ***91% below*** the all-time high of $75.03 on June 1, 2008 when coal prices were at their peak.

180.    To be sure, by July 27, 2012, it was patently clear, or should have been clear, to the Plan's fiduciaries, that a permanent structural shift in the only true business segment that comprised Arch Coal's business, *i.e.*, coal, was irreparably compromised for the foreseeable future given, *inter alia*, the depressed prices of coal prices and drastically reduced demand for coal over the last several years.  Because of these and other factors delineated above, by July 27, 2012, the basic risk profile and future business prospects of Arch Coal had so dramatically changed, that continued deterioration of the price of Arch Coal Stock was inevitable, making Arch Coal Stock an imprudent Plan investment option.

181.    The news only got worse from this point forward.  Just a week later, "in an investor presentation released Aug. 7, [2012] Arch Coal Inc. offered a more pessimistic view for metallurgical coal in the current global market than in a May presentation."   Darren Epps,

"Metallurgical Coal Markets Suddenly Unattractive, Arch Says," *SNL Daily Coal Report*, August 9, 2012.  "Arch said seaborne coal markets, including met coal, were oversupplied by about 25 million tonnes in the first half in 2012." *Id*.  Just in May 2012, Arch claimed the met coal market was poised for recovery.  *Id*.

182.     More bad news followed.  On September 12, 2012, Arch Coal announced that it would idle the Imperial Mine in Upshur, West Virginia, due to a lack of market demand.  *See* Darren Epps, "Arch Coal Idling Imperial Mine in West Virginia, Moving Employees to Leer," *SNL Daily Coal Report*, September 13, 2012.

183.     On September 30, Arch Coal's Z-Score remained at .59, still in the distress zone. By year's end, however, Arch Coal's Z-Score had dropped even lower to .41, falling further into the distress zone.

184.     The Company reported a net loss of $295 million for the fourth quarter of 2012 and a net loss of $681.6 million for the year.  *See* Arch Coal Inc., *Arch Coal, Inc. Reports Fourth Quarter and Full Year 2012 Results* [press release], February 5, 2013 at 1.  Arch Coal's total assets declined by $207.2 million, while liabilities increased to almost $7.2 billion from 2011 to 2012.  *Id* at 8.

**2013 Was a New Year But the Same Old Story for Arch Coal**

185.     As 2013 began, there was no mistaking the fact that there was no recovery in sight for Arch Coal or the coal industry in general.  In February 2013, "Arch Coal Inc. CFO John Drexler said …that the company expects Central Appalachia coal production to total less than 130 million tons in 2013, down from about $185 million tons in 2011, due to a **'collapsing'** thermal market for the high-Btu coal."  *See* Darren Epps, "Arch Sees Central App Thermal Market Collapsing; Idled Mines Unlikely to Return," *SNL Daily Coal Report*, February 27, 2013

(emphasis added).  Arch closed 10 complexes in the area and Drexler said, "we don't see those coming back in the near term."  *Id*.

186.     Arch Coal reported it had a net loss of $70 million for the first quarter of 2013, ending March 31, 2013, compared to a net income of $1.4 million for the same quarter of the previous year.  *See* May 8, 2013 Form 10-Q at 6.  Furthermore revenue for the first quarter fell to $825.5 million, a drop of nearly 20% from a year back.  *Id* at 3.

187.     At the end of the first quarter of 2013, Arch Coal's Z-Score had dropped even further to .3 and its debt to equity ratio had increased to 1.84.

188.     Analysts continued to forecast bleak conditions for the coal industry stating that "Weak economic conditions in Europe, slower growth in Asia and readily available supply across the globe are impacting the international markets for both thermal coal and metallurgical coal."  *Get ready for drop in US coal exports, industry official say*, SNL Daily Coal Report, Apr. 29, 2013.  Citigroup Global Markets Inc. in particular predicted that 2013 would see price declines in almost all commodities, including thermal coal.  *Id*.

189.     On May 10, 2013, Fitch Ratings downgraded the ratings for Arch Coal to B-, six steps into junk territory, from B.  *See* Debbie Cai, "Fitch Cuts Arch Coal Rating on Oversupply of U.S. Coal," *Dow Jones News Service*, May 10, 2013.  Reasons given for the downgrade were that "[d]omestic oversupply in steam coal [was] expected to result in substantially lower earnings" through the year, and the Company noted that weak metallurgical coal prices could persist beyond the year.  *Id*.  Additionally, "Fitch also [saw] lower earnings, combined with high debt levels after the acquisition of International Coal Group in 2011, as leading to high leverage metrics over the ratings horizon."  *Id*.

190. In early June 2013, citing, "difficult and persistently weak coal markets," Arch Coal announced that it was idling two mines at its Cumberland River complex and some operations at its Hazard complex in Kentucky." *See* Dan Lowrey, "Arch Coal Curtailing Additional Met Coal Production, Laying Off 110," SNL *Coal Daily Report*, June 10, 2013. "Arch already [had] laid off hundreds of Appalachian coal miners … and cut millions of tons of production in response to a worldwide decline in coal demand and excess supply from other coal-producing regions." *Id*.

191. At the end of June 2013, with the "lingering slump in coal markets," Arch Coal announced that it had agreed to sell three of its non-core Utah mines in order to give the company more "financial flexibility." *See* Jeffrey Tomich, "Arch Coal to Sell Utah Mines for $435 Million," *St. Louis Post-Dispatch*, June 29, 2013.

192. As of June 30, 2013, Arch Coal's Z-Score remained in the distress zone at 0.43.

193. For the second quarter of 2013, ending June 30, 2013, the Company had a net loss of $74.2 million. *See* July 30, 2013 Form 10-Q at 3. Further, revenues for Arch Coal declined over 20% from the same quarter in 2012, dropping to $766.3 million. *Id*. at 3. The Company also lost 8.2% of its cash and cash equivalents from the beginning of the year falling to $644.2 million. *Id*. at 5.

194. For the third quarter of 2013, ending September 30, 2013, Arch Coal had a net loss of $128.4 million. *See* November 12, 2013 Form 10-Q at 3. This third quarter loss brought the Company's total loss for the year to date to $270.6 million. *Id*. at 3.

195. By the end of the third quarter of 2013, Arch's debt-to-equity ratio stood at 1.97. The Company's Z-Score continued to languish in the distress zone at .32.

196.     In October 2013, another alarm sounded for the U.S. coal industry, with the release of a study noting that most of the coal estimated to exist in the U.S. is "buried too deeply," or was otherwise too unprofitable to extract, and thus unlikely to be mined.  Speaking for the Institute for Energy Economics and Financial Analysis ("IEEFA"), Tom Sanzillo stated that the country will undergo a shift in its energy mix, leading to an industry that would "be smaller with less producers, fewer mines and higher prices."  *See New reports say US has reached 'peak coal'*, SNL Daily Coal Report, Oct. 31, 2013.

197.     Before it reported its fourth quarter 2013 results, "Arch Coal warned it expects to post lower-than-planned shipments and production levels from some facilities."  *See* Ben Fox Rubin, "Arch Coal Warns of Lower-Than-Expected Shipments, Production," *Dow Jones Industrial News*, January 21, 2014.  Powder River Basin shipments declined more than 15% because of rail service issues.  *Id*.  "Arch has idled several operations and reduced its production in mining complexes throughout Appalachia due to persistent decline in demand for coal-based electricity.  Power plants have been switching to natural gas as prices hover near 10-year lows.  Additionally, increased environmental regulation and rising costs have compounded the coal producers' challenges."  *Id*.

198.     For the year ending December 31, 2013, Arch Coal had a net loss of $641.8 with revenues dropping 20% from 2012.  February 28, 2014 Form 10-K at F-5.  Further, Arch Coal lost over a billion dollars of its total assets for the year prior.  *Id*. at F-7.

199.     At year's end, December 31, 2013, Arch Coal's Z-score dropped even lower to 0.22.  Its debt to equity ratio was now at 2.29.

**The Company's Struggles Continued and the Losses Mounted Throughout 2014**

200.    Shockingly, while the Plan and its Participants' retirement savings continued to shrink as a result of the diminution in the value of Arch Coal Stock, Defendant Eaves saw his compensation rise from $4.3 million in 2013 to $7.3 million in 2014.[11]

201.    In the first half of 2014, Citigroup published three reports which reiterated the major structural decline in the coal industry caused by new, stricter emission standards, increasing competition by renewable energy sources and limited feasibility in opening new coal plants in the wake of older plant retirement.  "In short, Citigroup says, the evolution in electricity markets is being driven by a combination of regulatory and technology changes."  *See Beginning of the end for coal?  Citi sees structural decline*, Renew Economy, May 15, 2014, available at http://reneweconomy.com.au/2014/beginning-end-coal-citi-sees-structural-decline-30396.

202.    In February 2014, recognizing its critical situation, Arch Coal begun to take desperate measures. Seeking to "increase cash flow" and "improve operational efficiencies" Arch Coal reduced its dividend to $0.01 per share and also announced that it sold its ADDCAR Systems LLC subsidiary for $21 million.  *See* Darren Epps, "Arch Coal Sells Highwall Mining Unit for $21M, Declares Annual Dividend," *SNL Energy M&A Review*, March 1, 2014.  Arch had acquired ADDCAR as part of the International Coal Group deal in 2011.  *Id.*  The ADDCAR divestiture came less than eight months after Arch Coal announced plans to sell Utah longwall mines to Bowie Resources LLC.  *Id*.

203.    Then, on March 5, 2014, Arch Coal announced it reached a deal to sell its Hazard subsidiary in Central Appalachia to Blackhawk Mining for $26.3 million.  *See* Darren Epps, "Arch Coal Makes Another Deal, Sells Hazard Unit to Blackhawk Mining," *SNL Daily Coal Report*, March 6, 2014.

---

[11]  *See* Dan Lowrey, "Arch Coal CEO Eaves' 2014 Compensation Rises to $7.3 Million," *SNL Daily Coal Report*, March 3, 2015.

204.    Jefferies LLC downgraded Arch Coal on March 25, 2013 because of "sluggish" metallurgical coal prices and lower natural gas prices.  See Dan Lowrey, "Analyst Downgrades Arch Coal, Alpha Natural on Outlook for Met Coal, Gas Prices," SNL Daily Coal Report, March 26, 2013.  Jefferies analyst Peter Ward noted that Arch Coal "made untimely acquisitions during a cyclical high in met coal markets that they are now paying for with heavy debt loads."  *Id*. "The problem is that Arch needs a lot of free cash flow in order to materially reduce its high debt level."  *Id*.

205.    Arch Coal's third quarter results for the period ending March 31, 2014, were dismal.  The Company had a net loss of $124.1 million compared to a loss of $70 million for the same quarter last year, an increase loss of **77.2%**.  *See* May 12, 2014 Form 10-Q at 3.

206.    As of March 31, 2014, Arch Coal's Z-score was 0.19, meaning the Company continued to remain at great risk of bankruptcy.  Additionally, its debt to equity ratio had increased to 2.42.

207.    May 2014 brought more bad news for the coal industry and Arch Coal.  The IEEFA noted that there was a global shrink in the demand for thermal coal.  Increasing Chinese coal production would further limit the ability of American and Australian mines to offset shrinking domestic use through exports, as well as China's own environmental initiatives and move to more efficient energy generation.  *See Briefing Note: Thermal Coal Outlook*, May 15, 2014 at 6, available at http://ieefa.org/thermal-coal-outlook-may2014/.  United States thermal coal capacity would continue to fall, with newer natural gas and solar power plants vastly outnumbering new coal plant additions.  *Id*. at 6-7.  Further, Europe and Japan were increasingly relying on stronger output from renewable energy sources, including off-shore wind farms and new solar power capacities.  *Id*. at  7-8.

208.    In June 2014, the Environmental Protection Agency announced new regulations for curbing carbon dioxide emissions from power plants, with major implications for both power plants and the coal companies that supply them. *See* Jacob Barker, "Carbon Rules Loom Large for Coal-Heavy Missouri, Illinois," *St. Louis Post Dispatch*, June. 1, 2014.   Arch Coal was obviously shaken by the news as Arch Coal Senior VP of Strategy and Public Policy, Deck S. Sloan, responded to the EPA's proposed regulations by expressing how "costly" the regulations would be. *See* "Arch Coal Comments on EPA's Greenhouse Gas Regulations," *Energy Monitor Worldwide*, June 10, 2014.

209.    Arch Coal's financial results for the second quarter of 2014, ending June 30, 2014 presented more gloomy news.   The Company had a net loss of $96.9 million compared to a loss of $72.2 million for the same quarter 2013. *See* August 8, 2014 Form 10-Q at 3.   The Company also lost $334 million in total assets since the start of the year. *Id* at 5.

210.    On June 30, 2014, Arch's Z-Score remained in the distress zone at 0.13.   The Company's debt to equity ratio was now ***2.53***.

211.    The hemorrhaging continued.   On July 21, 2014 Arch Coal reported it was laying off 213 employees and closing its Cumberland River Coal Company Complex. *See* Jacob Kirn, "Arch Coal Lays Off 213 in Appalachia Mine Closure," *St. Louis Business Journal*, July 21, 2014.   This was a clear sign of the Company's financial difficulties.   According to Arch Coal President and CEO, John Eaves, the closure reduced Arch Coal's annual 2013 metallurgical coal sales volumes by about 200,000 tons. *Id*.

212.    September brought more bad news for the U.S. coal industry and Arch Coal. According to a report issued by the EIA, in the first half of 2014, 4,350 megawatts of new generation capacity came online, completely attributable to natural gas, solar, wind and other

sources.  No coal capacity was added.  Even the 1,500 megawatts of coal-fired capacity added in

2013 was minimized by the 4,500 megawatt capacity added by natural gas-fired plants that same

year, as demonstrated by this chart:



*See Natural gas, solar, and wind lead power plant capacity additions in first-half 2014*, EIA,
Sept. 9, 2014, available at http://www.eia.gov/todayinenergy/detail.cfm?id=17891

213.    For the third quarter of 2014, ending September 30, 2014, Arch Coal posted yet

another net loss, this time of $97.2 million; bringing total losses for the year to $318.2 million.

*See* November 7, 2014 Form 10-Q at 3.

214.    As of September 30, 2014, Arch Coal Stock was trading at $2.40, down ***64%*** from

its value at the start of the Class Period.

215.    By November 2014, IEEFA noted the sharp decline of U.S. coal stocks relative

the positive performance of the stock market:

> While the overall U.S. stock market has risen dramatically since
> 2010, **U.S. coal stocks have collapsed, and the U.S. coal
> industry is in its fourth year of decline**.  Third-quarter earnings
> reports show the trend continuing.  The four largest producers in
> the Power River Basin (Alpha, Arch, Cloud Peak, and Peabody)
> continue to see their stock prices drop as they report declining
> revenues, tighter margins, and distressed asset sales.

*See 20 Fourth-Quarter Questions for Powder River Basin Coal Producers*, Nov. 11, 2014 at 1 (emphasis added), available at http://ieefa.org/20questions/.

216.    The article further detailed that each producer reported declining revenues ranging from 10 to 30 percent from 2011 through 2013.  *Id*.  Noting a "fundamental structural coal-industry change," due in part to increased, constant competition from cheap natural gas as well as a diminishing likelihood with the industry's ability to offset domestic losses with exports, the article saw "little true likelihood of a significant turnaround."  *Id*.

217.    Arch Coal was not the only coal company to experience stock market declines due to the downturn in the industry as a whole.  As explained by SNL Daily Coal Report:

> Under assault from almost every direction, **U.S. coal equities saw their value shrink to historic lows**, with some equities hitting all-time lows.

*See Peabody hits back at coal critics, calling for rejection of 'climate alarmism'*, Sept. 29, 2014 (emphasis added).

218.    For the year ending December 31, 2014, Arch Coal reported a net loss of $558.4 million.  *See* February 27, 2015 Form 10-K at 61.  This marked the ***third straight year*** that Arch Coal reported a net loss of income.  *Id*. at 61.  Revenues declined for the fourth straight year dipping to $2.9 billion.  *Id*. at 61.  Arch Coal's total assets also declined for the ***fourth straight year,*** this year falling 6.2% from $8.99 billion in 2013 to $8.43 billion in 2014. *Id*. at 61.


**In 2015, Arch Coal Fared No Better as the Company' Financial Condition Continued to Deteriorate, Losses Continued to Mount and its Stock Price Continued to Plummet**

219.    At the beginning of 2015, Arch Coal Stock was trading below $2 a share, recording a per share price of $1.68 on January 2, 2015.  A month later, in the midst of its continuing struggles, the Company announced that it would stop paying dividends to investors

"in light of ongoing market weakness."  *See* "Arch Coal Posts Smaller Loss, Stops Dividend Payments," *Associated Press State & Local*, February 3, 2015.

220.    Arch Coal's financial results for the first quarter of 2015, ending March 31, 2015, was once again extremely disappointing.  As reported, the Company had a net loss of $113.2 million, the **tenth straight quarter** posting a loss.  *See* April 30, 2015 Form 10-Q at 3.  The company had also lost $115 million in total assets since the end of year 2014.  *Id*. at 5.

221.    By March 31, 2015 Arch Coal's Z-Score stood at .23 and its debt to equity ratio was a dreadful 3.3 meaning the Company's  debt was **more than three times its equity**.

222.    A little over a month later on May 6, 2015, Bank of America published a new coal policy, attached as Exhibit C, that cemented the generally held view that the coal industry was an unduly risky segment in which to invest.  Following a due diligence review, the bank announced:

> Over the past several years, Bank of America has significantly reduced our exposures to coal extraction companies.  Going forward, Bank of America will continue to reduce our credit exposure to coal extraction companies.  This commitment applies globally, to companies focused on coal extraction and to divisions of diversified mining companies that are focused on coal.

*Id*. at 1.

223.    The dire outlook for the coal industry shows no signs of abating.  On May 12, 2015, Patriot Coal filed for bankruptcy protection for the second time in three years, the results of competition from natural gas, high emission standards and weakened demand for metallurgical coal in China.  It had emerged from the previous bankruptcy in December 2013, having reduced its debt from $3.07 billion to $545 million through the sale of assets and the closure of some mines.  *See Patriot Coal Files for Second Bankruptcy in Three Years Amid Commodity Price Slump*, BNA's Bankruptcy Law Reporter, May 12, 2015, available at http://www.bloomberg.com/news/articles/2015-05-12/patriot-coal-files-for-bankruptcy-after-

commodity-price-slump.  Not surprisingly, "Patriot's woes are indicative of **the wider malaise in the coal industry**."  *See* Nick Cunningham, *Latest Casualty In Energy's Hardest Hit* Industry, Yahoo Finance, May 25, 2015, available at http://finance.yaoo.com/news/latest-casualty-energy-hardest-hit-202728319.html.

224.   Other coal companies to file for protection recently include Longview Power LLC, Dynegy Inc., Edison Mission Energy, James River Coal Co., America West Resources Inc., Trinity Coal Corp., Americas Energy Co., Clearwater Resources LP and Consolidated Energy.  *See Patriot Coal Files for Second Bankruptcy in Three Years Amid Commodity Price Slump*, BNA's Bankruptcy Law Reporter, May 12, 2015, available at http://www.bloomberg.com/news/articles/2015-05-12/patriot-coal-files-for-bankruptcy-after-commodity-price-slump.  An additional four companies, including Arch Coal were seen as distressed:  Walter Energy had raised the possibility of its own bankruptcy filing, Alpha Natural Resources Inc., the second-largest coal producer by sales, was warned by the New York Stock Exchange that its shares would be delisted if its shares continued to trade below $1, and Arch Coal and Peabody Energy Corp. had each lost over 75% of their share value since 2014.  *Id*.

225.   Less than two weeks after Patriot Coal's bankruptcy filing, Arch Coal released a statement on May 22, 2015, "**that it no longer satisfies the minimum standards necessary to be listed on the New York Stock Exchange**."  *See* Tony Owusu, "Arch Coal (ACI) Tanks on Debt Restructuring Negotiations, NYSE Delisting Notice," *Thestreet.com*, May 26, 2015 (emphasis added).  After having a stock price **below $1** for 30 consecutive trading days, Arch

---

[12]  Penny stocks are loosely defined as "any stock that trades for pennies or those that trade for under  $5."   *See*  http://www.investopedia.com/terms/p/pennystock.asp.   Such stocks  "are generally considered to be ***highly speculative and high risk*** because of their lack of liquidity, large bid-ask spreads, small capitalization and limited following and disclosure.  They will often trade over the counter through the OTCBB and pink sheets.  *Id*.

Coal received a delisting notice.  *Id*.  Arch Coal Stock is now effectively a "penny stock" trading for less than $.50 as of the filing of the instant complaint.[12]

226.    Another blow to Arch Coal and the coal industry was the recent revelation in an article that the Office of Surface Mining Reclamation and Enforcement (OSMRE), "the nation's leading coal industry regulator" is examining whether coal companies, including Arch Coal, still qualify for a government program that allows coal companies to self-insure or "self-bond" for clean-up costs in case of bankruptcy.  *See* Patrick Rucker, *Coal Giant Peabody Faces Federal Scrutiny Over Clean-Up Insurance*, *Yahoo! Finance*, June 4, 2015, *available at* http://finance.yahoo.com/news/coal-giant-peabody-faces-federal-174047899.html.  The reason for the examination is OSMRE's concern that "slumping coal prices and declining demand have put industry balance sheets under stress, raising questions about whether … coal firms meet the financial criteria to self bond."  *Id*.  Importantly, as the article notes, "the shares of many major coal companies … have fallen by more than 90 percent in the last four years **and industry analysts warn that near-term bankruptcies are a real danger**."  *Id.* (emphasis added).

227.    According to Greg Conrad, director of the Interstate Mining Compact Commission which speaks for coal producing states, "[t]his is the first time we've see [sic] this: a downturn in the coal industry raising questions about self bonds."  *Id.*

228.    If Arch Coal were to be disqualified from the government program, it would be subjected to substantial cost increases as it would have to pay market rates to insure the billions of dollars required to restore old mines and ravaged landscapes back to health.  *Id.*

229.    By the end of 2014, it appeared that Arch Coal would no longer qualify to self-bond.  In order to maintain its qualification for self-bonding, Arch Coal "must have a ratio of total liabilities to net worth of 2.5 times or less, and a ratio of current assets to current liabilities

of 1.2 times or greater." *Id.*  However, a review of securities filings found that Arch Coal failed

both those tests at the end of 2014.  *Id.*

230.    As of the filing of the instant complaint, for all the reasons set forth above, Arch

Coal has been and remains an imprudent investment option for the Plan.

### DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT ARCH COAL WAS AN IMPRUDENT INVESTMENT FOR THE PLAN, YET FAILED TO PROTECT THE PLAN'S PARTICIPANTS

231.    As illustrated by the following chart, Arch Coal's tenuous financial condition as

measured by, *inter alia*, its Z-Score and debt-equity ratio began in early 2012, but accelerated

sharply during the third quarter ending September 30, 2012.



232.    Further, as the below graph of Arch Coal's performance relative to the S&P 500

makes clear, the Company has severely underperformed the general market:



Source:
http://www.google.com/finance?q=INDEXSP%3A.INX&ei=DhtuVZLQKcG7rgGHt4HgDQ.

233.    Arch Coal is radically underperforming compared to the oil and gas sector as well as the S&P 500 Index, having lost over 93% of the share price in three years compared to a sector increase of nearly 12%:



Source:
https://eresearch.fidelity.com/eresearch/markets_sectors/sectors/industries.jhtml?tab=learn&industry=101020

234.    Even compared to the Dow Jones U.S. Coal Index, Arch Coal has lost more market capitalization than its peers:



Source:  Google Finance http://www.google.com/finance?cid=4931635

235.    The Company's financial condition, when viewed through the lens of objective financial metrics, plainly indicates the Company's deterioration over the last several years. During the Class Period, although they knew or should have known that Company Stock was an imprudent investment for the Plan, Defendants did nothing to protect the significant investment of the Plan Participants' retirement savings in Arch Coal Stock.

236.    Since the beginning of the Class Period through the filing of the instant complaint, the Plan's imprudent investments in Arch Coal Stock have been decimated, as indicated below:



Source:  http://bigcharts.marketwatch.com.

237.    As a result of the enormous erosion of the value of Arch Coal, the Plan's Participants, the retirement savings of whom were heavily invested in Arch Coal Stock, suffered unnecessary and unacceptable losses.

238.    Because of their high ranking positions within the Company and/or their status as fiduciaries of the Plan, Defendants knew or should have known of the existence of the above-mentioned problems.

239.    Defendants knew or should have known that, due to the Company's spiraling financial reality and outlook given its exposure to losses stemming from the problems described above, Company Stock was imprudent no matter what its price.  Regardless, the Company Stock price inevitably dropped drastically and steadily beginning in 2011, a year before the start of the Class Period, and continued throughout the Class Period due to the pervasive problems facing the Company.  There was absolutely no objective evidence that the Company Stock price would

or could recover.  Yet, Defendants failed to protect the Plan and its Participants from these foreseeable losses.

240.    Upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.  Defendants also failed to conduct an appropriate investigation into whether Arch Coal Stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's Participants with information regarding Arch Coal's problems so that the Plan's Participants could make informed decisions regarding whether to include Arch Coal Stock in their accounts in the Plan.

241.    An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Arch Coal Stock during the Class Period was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted during the Class Period to protect the Plan's Participants against unnecessary losses, and would have made different investment decisions.

242.    Because Defendants knew or should have known that Arch Coal Stock was not a prudent investment option for the Plan during the Class Period, they had an obligation to protect the Plan and its Participants from unreasonable and entirely predictable losses incurred during the Class Period as a result of the Plan's investment in Arch Coal Stock.

243.    Defendants had available to them several different options for satisfying this duty, including, among other things:  divesting the Plan of Arch Coal Stock; discontinuing further contributions to and/or investment in Arch Coal Stock under the Plan; resigning as fiduciaries of the Plan if, as a result of their employment by Arch Coal, they could not loyally serve the Plan and the Plan's Participants in connection with the Plan's acquisition and holding of Arch Coal

Stock; making appropriate public disclosures as necessary; and/or consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the Participants of the Plan.

244.    Despite the availability of these and other options, Defendants failed to take any adequate action during the Class Period to protect the Plan's Participants from losses resulting from the Plan's investment in Arch Coal Stock.

**AT LEAST CERTAIN OF THE DEFENDANTS SUFFERED
FROM CONFLICTS OF INTEREST**

245.    Pursuant to the duty of loyalty, an ERISA fiduciary must discharge his duties solely in the interest of the participants and beneficiaries.  29 U.S.C. § 1104(a)(1)).

246.    Arch Coal's SEC filings during the Class Period, including Form DEF 14A Proxy Statements, make clear that a portion of certain officers' compensation, including Defendants Eaves and Lang, was in the form of stock awards and option awards.  For example, in 2014, Defendant Eaves received $2,744,517 in stock awards while Defendant Lang received $1,628,718.  *See* 2014 Form DEF 14A Proxy Statement (filed Mar. 20, 2015) at 60.

247.    Defendant Eaves and Lang were also beneficial owners of Arch Coal Stock.  As of February 26, 2015, Defendants Eaves and Lang owned 315,712, and 99,416 shares of Arch Coal Stock, respectively.  *Id.* at 33.

248.    Because of at least some of the Defendants' compensation in Arch Coal Stock and ownership of Arch Coal Stock, these Defendants had a conflict of interest which put them in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan's Participants, whose interests Defendants were obligated to loyally serve with an "eye single" to the Plan.  *See generally Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251-52 (1993); 29 U.S.C. § 1104(a)(1)(B).  These Defendants, while attempting to shore up Arch

Coal during the Class Period as its stock price inevitably plummeted, abandoned their duties to the Plan and its Participants, and failed to consider at any time during the Class Period what was in the best interest of the Plan and its Participants as they should have done as Plan fiduciaries.

249.    Some Defendants may have had no choice in tying their compensation to Arch Coal Stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plan's Participants' retirement savings tied up to a large extent in Arch Coal Stock or to take steps to protect the Plan and its Participants.

## CLAIMS FOR RELIEF UNDER ERISA

250.    At all relevant times, Defendants are/were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

251.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

252.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

253.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and, as courts within this Circuit have noted, these duties "have been described as 'the highest known to the law.'" *See, e.g.*, *Braden*, 588 at 598 (quoting *Donovan*, 680 F.2d at 272 n.8).

254.    These duties entail, among other things:

(a)    the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

(b)    the duty to avoid conflicts of interest and to resolve them promptly when they occur.   A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

(c)    the duty to disclose and inform, which encompasses:  (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

255.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

[I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if

he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

256.    Plaintiff therefore brings this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## COUNT I

### FAILURE TO PRUDENTLY AND LOYALLY MANAGE THE PLAN'S ASSETS (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404 AND 405 BY THE COMPANY DEFENDANT AND THE RETIREMENT COMMITTEE DEFENDANTS)

257.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

258.    This Count alleges fiduciary breaches against the Company Defendant and the Retirement Committee Defendants (the "Prudence Defendants").

259.    At all relevant times, as alleged above, the Prudence Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they had or exercised discretionary authority or control over the administration and/or management of the Plan and/or exercised any authority or control over the disposition of the Plan's assets.

260.    Under ERISA, fiduciaries who have or exercise discretionary authority or control over management of a plan or exercise any authority or control over the disposition of a plan's assets are responsible for ensuring that all investment options made available to participants

under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  The Prudence Defendants were responsible for ensuring that all investments in Company Stock in the Plan were prudent.  The Prudence Defendants are liable for losses incurred as a result of such investments being imprudent.

261.    According to DOL regulations interpreting the duty of prudence, in order to comply with the duty of prudence, a fiduciary must give "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role that the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties."  29 C.F.R. § 2550.404a-1(b)(1).  "Appropriate consideration," according to DOL regulations, includes but is not necessarily limited to "(i)[a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed…to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action." 29 C.F.R. § 2550.404a-1(b)(2).

262.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.   ERISA  §  404(a)(1)(D), 29  U.S.C.  § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct, or who are directed by the plan, including plan trustees, to do so.

263.   The Prudence Defendants' duty of loyalty and prudence also obligates them to speak truthfully to Participants, not to mislead them regarding the Plan or its assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plan.  This duty to inform Participants includes an obligation to provide Participants with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding Plan investments/investment options such that Participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.

264.   The Prudence Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period, the Prudence Defendants knew or should have known that, as described herein, Company Stock was not a suitable and appropriate investment for the Plan.  Yet, during the Class Period, despite their knowledge of the imprudence of the investment, the Prudence Defendants failed to take any meaningful steps to protect Plan's Participants from the inevitable losses that they knew would ensue as the already-weakened Arch Coal faced mounting losses as the core of its business model – the coal industry – became increasingly obsolete and its ultimate demise became more of a likelihood.

265.   The Prudence Defendants further breached their duties of loyalty and prudence by failing to divest the Plan of Company Stock during the Class Period when they knew or should have known that it was not a suitable and appropriate investment for the Plan.

266.   The Prudence Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plan from inevitable losses.  The Prudence Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

267.    As a direct and proximate result of the breaches of fiduciary duties during the Class Period alleged herein, the Plan and, indirectly, Plaintiff and the Plan's other Participants and beneficiaries lost a significant portion of their retirement investments.  Had the Prudence Defendants taken appropriate steps to comply with their fiduciary obligations during the Class Period, Participants could have liquidated some or all of their holdings in Company Stock and thereby eliminated, or at least reduced, losses to the Plan and themselves.

268.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### BREACH OF DUTY TO AVOID CONFLICTS OF INTEREST
### (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404 AND 405 BY THE DIRECTOR AND FINANCE COMMITTEE DEFENDANTS)

269.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

270.    This Count alleges fiduciary breaches against the Director and Finance Committee Defendants (the "Conflicts of Interest Defendants").

271.    At all relevant times, as alleged above, the Conflicts of Interest Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

272.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty, that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

273.     During the Class Period, the Conflicts of Interest Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*:  failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities; and by otherwise placing their own and/or the Company's interests above the interests of the Participants with respect to the Plan's investment in Company Stock.

274.     As a consequence of the Conflicts of Interest Defendants' breaches of fiduciary duty during the Class Period, the Plan suffered tens of millions of dollars in losses, as its holdings of Company Stock were devastated.  If the Conflicts of Interest Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and, indirectly, Plaintiff and the Plan's other Participants, lost a significant portion of their retirement investments.

275.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

**FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES AND
PROVIDE THEM WITH COMPLETE AND ACCURATE INFORMATION
(BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404
BY THE COMPANY, DIRECTOR, AND FINANCE COMMITTEE DEFENDANTS)**

276.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

277.    This Count alleges fiduciary breaches against the Company, Director, and Finance Committee Defendants (the "Monitoring Defendants").

278.    At all relevant times, as alleged above, the Monitoring Defendants were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

279.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of other Plan fiduciaries.

280.    Under ERISA, a monitoring fiduciary must ensure that monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of a plan's assets, and must take prompt and effective action to protect the plan and participants when they are not.

281.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to the plan's participants or for deciding whether to retain or remove them.

282.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan's

assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

283.   During the Class Period, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)   failing, at least with respect to the Plan's investment in Company Stock, to properly monitor their appointee(s), to properly evaluate their performance, or to have any proper system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and inaction with respect to Company Stock;

(b)   failing to ensure that the monitored fiduciaries appreciated the true extent of the Company's precarious financial situation and the likely impact that financial failure would have on the value of the Plan's investment in Company Stock;

(c)   to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets and, in particular, the Plan's investment in Company Stock; and

(d)   failing to remove appointees whose performance was inadequate in that they continued to permit the Plan to make and maintain investments in the Company Stock despite the practices that rendered it an imprudent investment during the Class Period.

284.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided.

285.    The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by those Defendants, and they failed to make any effort to remedy these breaches despite having knowledge of them.

286.    Therefore, as a direct and proximate result of the breaches of fiduciary duty by the Monitoring Defendants during the Class Period alleged herein, the Plan and, indirectly, Plaintiff and the Plan's other Participants and beneficiaries, lost tens of millions of dollars of retirement savings.

287.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**COUNT IV**

**FAILURE TO PRUDENTLY AND LOYALLY MANAGE THE PLAN'S ASSETS (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404 AND 405 BY DEFENDANT MERCER)**

288.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

289.    This Count alleges fiduciary breaches against Mercer (the "Trustee Defendant").

290.    At all relevant times, as alleged above, the Trustee Defendant was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that it had or

exercised discretionary authority or control over the administration and/or management of the Plan or exercised any authority or control over the disposition of the Plan's assets.

291.   As noted above, according to DOL regulations interpreting the duty of prudence, a fiduciary must give "appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role that the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties."  29 C.F.R. § 2550.404a-1(b)(1). "Appropriate consideration," according to DOL regulations, includes but is not necessarily limited to "(i)[a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed…to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action." 29 C.F.R. § 2550.404a-1(b)(2).

292.   Under ERISA, fiduciaries who have or exercise discretionary authority or control over management of a plan or exercise any control over the disposition of a plan's assets are responsible for ensuring that all investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  The Trustee Defendant could not blindly follow directions of the Prudence Defendants if they knew or should have known such directions were improper under ERISA.

293.   A directed trustee's duty of prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.   ERISA § 404(a)(1)(D), 29 U.S.C. §

1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct, or who are directed by the plan, including plan trustees, to do so.

294. The Trustee Defendant breached its duties to prudently and loyally manage the Plan's assets. During the Class Period, the Trustee Defendants knew or should have known that, as described herein, Company Stock was not a suitable and appropriate investment for the Plan. Yet, during the Class Period, despite its knowledge of the imprudence of the investment, the Trustee Defendant failed to take any meaningful steps to protect Plan's Participants from the inevitable losses that it knew would ensue as it became increasingly obvious that Arch Coal was in severe distress with no relief in the foreseeable future.

295. The Trustee Defendant further breached its duties of loyalty and prudence by failing to divest the Plan of Company Stock when it knew or should have known that it was not a suitable and appropriate investment for the Plan.

296. The Trustee Defendant also breached its co-fiduciary obligations by, among its other failures, knowingly participating in the failure of the Plan's other fiduciaries to protect the Plan from inevitable losses. The Trustee Defendant had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

297. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plan's participants and beneficiaries, lost a significant portion of their retirement investment. Had the Trustee Defendant taken appropriate steps to comply with its fiduciary obligations, Participants could have liquidated some or all of their holdings in Company Stock and thereby eliminated, or at least reduced, losses to the Plan.

298.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendant in this Count is liable to restore the losses to the Plan caused by its breaches of fiduciary duties alleged in this Count.

## CAUSATION

299.    The total Arch Coal price collapse of nearly 100% as of the filing of the instant complaint, which devastated the Plan's assets, could have and would have been avoided in whole or in part by Defendants complying with their ERISA fiduciary duties.  Defendants could have taken certain actions based on the publicly known information alone such as, and not limited to: investigating whether Arch Coal Stock was a prudent retirement investment; retaining outside advisors to consult them or to act as fiduciaries; seeking guidance from governmental agencies (such as the DOL or SEC); resigning as fiduciaries of the Plan; stopping or limiting additional purchases of Arch Coal Stock by the Plan; and/or by divesting the Arch Coal Stock held by the Plan.

300.    Despite these and other options, Defendants – who knew or should have known that Arch Coal Stock was an imprudent retirement investment – chose to, as fiduciaries, continue allowing the Plan to acquire further Arch Coal Stock, while taking no action to protect their wards as Arch Coal's condition worsened and the Plan's Participants' retirement savings were decimated.  Prudent fiduciaries would have acted otherwise and taken appropriate actions to protect the Plan and its Participants.

301.    To the extent Defendants wanted to take action based on non-publicly disclosed information that they were privy to, the following alternative options – which are pled as alternative statements under FED. R. CIV. P. 8(d)(2) to the extent they are inconsistent – were available to Defendants and (a) could have been done without violating securities laws or any

other laws, (b) should have been done to fulfill Defendants' fiduciary obligations under ERISA, and (c) would not have been more likely to harm the Plan than to help it.

302.    First, Defendants could have and should have directed that all Company and Participant contributions in Arch Coal Stock be held in cash.  The refusal to purchase Arch Coal Stock is not a "transaction" within the meaning of insider trading prohibitions.  This action would not have required any independent disclosures that could have had a materially adverse effect on the price of Arch Coal Stock.

303.    Alternatively, Defendants should have closed the Plan to further investment in Arch Coal Stock and directed that contributions be diverted from the Arch Coal Stock into other (prudent) investment options or, if there were no such instructions, the Plan's default investment option.

304.    Additionally, and importantly, because Defendants could and should have concluded that Arch Coal Stock was an imprudent retirement savings vehicle based solely upon public information, no disclosure was required before conducting an orderly liquidation of the Plan's holdings.

305.    Defendants also could have:

- sought guidance from the DOL or SEC as to what they should have done;

- resigned as Plan fiduciaries to the extent they could not act loyally and prudently; and/or

- retained outside experts to serve either as advisors or as independent fiduciaries specifically for the Plan and not the Company in general.

306.    The Plan suffered millions of dollars in losses during the Class Period because substantial assets of the Plan were imprudently invested, or allowed to be invested, by

Defendants in Company Stock during the Class Period, in breach of Defendants' fiduciary duties, as reflected in the diminished account balances of the Plan's Participants.

307.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and its Participants would have avoided a substantial portion of the losses that they suffered through the Plan's continued investment in Company Stock.

308.    Given the totality of circumstances prevailing during the Class Period, no prudent fiduciary would have made the same decision to retain the clearly imprudent Arch Coal Stock as an investment in the Plan.

309.    Despite the availability of these and other options, Defendants took no meaningful action during the Class Period to protect the Plan's Participants from losses as a result of the Company Stock's imprudence until it was too late to make any substantial difference.

**REMEDIES FOR BREACHES OF FIDUCIARY DUTY**

310.    As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

311.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan…."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

312.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative

investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

313.    Plaintiff, the Plan, and the Class are therefore entitled to relief from Defendants in the form of:  (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

314.    Each Defendant is jointly and severally liable for the acts of the other Defendants as a co-fiduciary.

### JURY DEMAND

Plaintiff demands a jury.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A.      A Judgment that the Defendants, and each of them, breached their ERISA fiduciary duties to the Participants during the Class Period;

B.      A Judgment compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.     A Judgment imposing a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.     A Judgment awarding actual damages in the amount of any losses the Plan suffered, to be allocated among the Plan Participants' individual accounts in proportion to the accounts' losses;

E.     A Judgment requiring that Defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in Arch Coal Stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price of Arch Coal Stock;

F.     A Judgment awarding costs pursuant to 29 U.S.C. § 1132(g);

G.     A Judgment awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.     A Judgment awarding equitable restitution and other appropriate equitable monetary relief against the Defendants.

Dated:  June 30, 2015                                Respectfully submitted,

                                                **DYSART TAYLOR COTTER**
                                                 **MCMONIGLE & MONTEMORE, P.C.**

                                                        By:   /s/ Don R. Lolli
                                                        Don R. Lolli
                                                        Bar Number:  56263MO
                                                        4420 Madison Avenue
                                                        Kansas City, MO 64111
                                                        Telephone:  (816) 931-2700
                                                        Facsimile:  (816) 931-7377
                                                        Email:  dlolli@dysarttaylor.com


                                                **KESSLER TOPAZ MELTZER & CHECK LLP**
                                                Edward W. Ciolko
                                                Donna Siegel Moffa
                                                Mark K. Gyandoh
                                                Julie Siebert-Johnson
                                                280 King Of Prussia Road
                                                Radnor, PA 19087
                                                Telephone:  (610) 667-7706
                                                Facsimile:  (610) 667-7056
                                                Email: eciolko@ktmc.com
                                                        dmoffa@ktmc.com
                                                        mgyandoh@ktmc.com
                                                        jsjohnson@ktmc.com

                                                *Counsel for Plaintiff*